1  **FE S. GARRETT**
   **PRO SE**
2  Reg. No. 07990-298
   The Geo Group
3  220 West C. Street
   San Diego, CA 92101
4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10                  **(HONORABLE M. JAMES LORENZ)**

11  UNITED STATES OF AMERICA,        )  Case No.    08CR0918-L
                                     )
12              Plaintiff,           )  DATE:       August 25, 2008
                                     )  TIME:       2:00 p.m.
13  v.                               )
                                     )  NOTICE OF MOTIONS AND MOTIONS:
14  **FE S. GARRETT**,               )
                                     )  (1)    TO COMPEL DISCOVERY AND
15              Defendant.           )         PRESERVE EVIDENCE;
                                     )         TO SUPPRESS STATEMENTS;
16                                   )  (2)
                                     )  (3)    TO SUPPRESS EVIDENCE;
                                     )  (4)    DISMISS INDICTMENT DUE TO
17                                   )         MISINSTRUCTION OF GRAND
                                     )         JURY;
18                                   )  (5)    DISMISS INDICTMENT DUE TO
                                     )         UNDUE DELAY IN FILING THE
19                                   )         CHARGES;
                                     )  (6)    DISMISS INDICTMENT DUE TO
20                                   )         SELECTIVE PROSECUTION;
                                     )  (7)    DISMISS THE INDICTMENT DUE
21                                   )         TO THE GOVERNMENT
                                     )         MISLEADING THE GRAND JURY;
22                                   )  (8)    DISMISS THE INDICTMENT FOR
                                     )         PROSECUTORIAL MISCONDUCT;
23                                   )  (9)    TO ORDER THE GOVERNMENT
                                     )         TO DISCLOSE IDENTITY OF
24                                   )         INFORMANT; AND
                                     )  (10)   TO PRODUCE WITNESS AND
25  _____)         EXHIBIT LISTS.
                                     )
26

27  TO:   KAREN P. HEWITT, UNITED STATES ATTORNEY; AND
          CHRISTOPHER S. STRAUSS, ASSISTANT UNITED STATES ATTORNEY:
28

1    PLEASE TAKE NOTICE that on August 25, 2008 at 2:00 p.m., Fe S. Garrett, appearing pro

2    se, will ask this Court to enter an order granting the following motions.

3                                          **MOTIONS**

4    The defendant, Fe S. Garrett, pursuant to the United States Constitution, the Federal Rules

5    of Criminal Procedure, and all other applicable statutes, case law and local rules, hereby moves this

6    Court for an order to:

7        1)    Compel discovery and preserve evidence;
         2)    To suppress statements;
8        3)    To suppress evidence;
         4)    Dismiss indictment due to misinstruction of the grand jury;
9        5)    Dismiss indictment due to undue delay in filing the charges;
         6)    Dismiss indictment due to selective prosecution;
10       7)    Dismiss indictment due to the government misleading the grand jury;
         8)    Dismiss indictment for prosecutorial misconduct;
11       9)    To order the government to disclose identity of informant; and
         10)   To produce exhibit and witness lists.
12
     These motions are based upon the instant motions and notice of motions, the attached
13
     statement of facts and memorandum of points and authorities, and all other materials that may come
14
     to this Court's attention at the time of the hearing on these motions.
15

16

17                                          Respectfully submitted,

18   DATED:        August 11, 2008          *Fe S. Garrett*
                                            **FE S. GARRETT**
19                                          Pro Se

20

21

22

23

24

25

26

27

28

                                              2                        08CR0918-L

1  **FE S. GARRETT**
   **PRO SE**
2  Reg. No. 07990-298
   The Geo Group
3  220 West C. Street
   San Diego, CA 92101

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10                   **(HONORABLE M. JAMES LORENZ)**

11  UNITED STATES OF AMERICA,        )    Case No. 08CR0918-L
                                     )
12          Plaintiff,               )
                                     )    STATEMENT  OF  FACTS  AND
13  v.                               )    MEMORANDUM  OF  POINTS  AND
                                     )    AUTHORITIES  IN  SUPPORT  OF
14  **FE S. GARRETT**,               )    DEFENDANT'S MOTIONS
                                     )
15          Defendant.               )
                                     )
16  _____

17                             **I.**

18                    **STATEMENT OF FACTS**[1]

19          The defendant has been charged in a superceding indictment with aiding and assisting the

20  preparation of false tax returns in violation of 26 U.S.C. § 7206(2); filing false tax returns in

21  violation of 26 U.S.C. § 7206(1); and wilful failure to pay taxes in violation of 26 U.S.C. § 7203.

22  The charges span a period of several years, beginning in March 2002 and continuing to 2008.  The

23  defendant was under investigation by the Criminal Investigation Division ("CID") of the Internal

24  Revenue Service ("IRS") for much of this period.  An 25-count indictment was returned against the

25

26

27

28          [1]  Unless otherwise stated, the "facts" referenced in these papers come from government-
    produced discovery that the defense continues to investigate.  Ms. Garrett does not admit the
    accuracy of this information and reserves the right to challenge it at any time.

1  defendant on March 27, 2008.   A 30-count superseding indictment was returned against the

2  defendant on May 29, 2008.  These motions follow.

3                                                            **II.**

4                            **MOTION TO COMPEL AND PRESERVE DISCOVERY**

5           The defendant requests the following discovery.  This request is not limited to those items

6  that the prosecutor knows of, but rather includes all discoverable materials that are in the custody,

7  control, care or within the knowledge of any closely-related investigator, prosecutor, of, or other

8  agency of the government.  United States v. Santiago, 46 F.3d 885 (9th Cir. 1995).

9           The Due Process clause of the Fifth Amendment, Rule 16 of the Federal Rules of Criminal

10  Procedure ("Rule 16"), as well as case law, impose a duty on the prosecution to disclose to the

11  defense upon request any information favorable to the accused that is within the prosecutor's

12  possession, either actual or constructive, and is material to the defendant's guilt or to sentencing.

13  Brady v. Maryland, 373 US 83 (1963).  This salutary principle imposes upon prosecutorial

14  authorities a strict duty to disclose and identify all material evidence favorable to the defense whether

15  or not it relates directly to the question of guilt and whether or not a request for a disclosure has been

16  made.  Giglio v. United States, 405 U.S. 150 (1972).

17          Specifically, Rule 16 requires the government to disclose, upon the defense's request, items

18  "material to preparing the defense," as well as items the government "intends to use in its case-in-

19  chief."  Fed.R.Crim P. 16(a)(1)(E)(i)&(ii); see also United States v. Reeves, 892 F.2d 1223, 1226

20  (5th Cir. 1990); United States v. Vue, 13 F.3d 1206, 1208 (8th Cir. 1994). This "rule is intended to

21  prescribe the minimum amount of discovery to which the parties are entitled.  It is not intended to

22  limit the judge's discretion to order broader discovery in appropriate cases."  Advisory Committee

23  Note on 1974 Amendment to Rule 16 (emphasis added).

24          The prosecution's discovery obligation has been enunciated by the United States Supreme

25  Court as:

26                    The [government's] obligation is not to convict, but to see that, so far as
                      possible, truth emerges. This is also the ultimate statement of its
27                    responsibility to provide a fair trial under the Due Process Clause of the
                      Fourteenth Amendment. No respectable interest of the State is served by
28

2                                                                          08CR0918-L

1

> its concealment of information which is material, generously conceived, to the case, including all possible defenses.

2

Giles v. Maryland, 386 US 66, 98 (1967).

3

4    The Due Process Clause of the Fifth Amendment requires the government to identify and

disclose evidence that is material and "favorable to [the] accused."  Brady, 373 U.S. at 87; see

5    also United States v. Bagley, 473 U.S. 667, 682 (1985).  Evidence favorable to the accused includes

6    not only evidence tending to exculpate them, but also any information that tends to impeach the

7    government's evidence or witnesses.  See Giglio, 405 U.S. at 154; Bagley, 473 U.S. at 676.

8

9    The rule announced in Brady is premised on a defendant's right to receive a fair trial, and

therefore the government should be required to adopt a liberal approach to disclosure.  Brady, 387

10   U.S. at 87; see also Kyles v. Whitley, 514 U.S. 419, 439 (1995) ("[A] prosecutor anxious about

11   tacking too close to the wind will disclose a favorable piece of evidence...This is as it should be.");

12   see also United States v. McVeigh, 954 F. Supp. 1441 (D. Colo. 1997) (Matsch, J.) ("Due Process

13   require the government lawyers to resolve their doubts in favor of disclosure.").  Such an approach

14   is necessary both to ensure "that justice shall be done," and "to preserve the criminal trial, as distinct

15   from the prosecutor's private deliberation, as chosen forum for ascertaining the truth about criminal

16   accusations."  Kyles, 514 U.S. at 439-40 (emphasis added).

17

18   Moreover, the prosecution has a duty to learn of and obtain all favorable evidence in the

possession of others acting on their behalf, including the police.  Kyles, 514 U.S. at 439; United

19   States v. Wood, 57 F.3d 733, 737 (9th Cir. 1995) (prosecutor is charged with knowledge of material

20   known to FDA).  The test for materiality is whether the requested evidence might affect the outcome

21   of the trial.  United States v. Agurs, 427 US 97 (1976).

22   1.    The Defendant's Statements.  The government must disclose to the defendant all copies

23   of any written or recorded statements made by her; the substance of any statements made by the

24   defendant that the government intends to offer in evidence at trial; any response by her to

25   interrogation; the substance of any oral statements that the government intends to introduce at trial

26   and any written summaries of her oral statements contained in the handwritten notes of the

27   government agent; any response to any Miranda warnings that may have been given to her; and any

28   other statements by her. Fed. R. Crim. P. 16(a)(1)(A) and (B).  The Advisory Committee Notes and

1  the 1991 amendments to Rule 16 make clear that the government must reveal *all* of the defendant's

2  statements, whether oral or written, regardless of whether the government intends to make any use

3  of those statements.

4       2.    <u>Arrest Reports, Notes and Dispatch Tapes</u>.  The defendant also specifically requests

5  that all arrest reports, notes and dispatch or any other tapes that relate to the circumstances

6  surrounding her arrest or any questioning, if such reports have not already been produced *in their*

7  *entirety*, be turned over to her.  This request includes, but is not limited to, any rough notes, records,

8  reports, transcripts or other documents in which statements of The defendant or any other

9  discoverable material is contained.  This is all discoverable under Fed. R. Crim. P. 16(a)(1)(A) and

10  (B) and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  <u>See also</u> <u>Loux v. United States</u>, 389 F.2d 911 (9th

11  Cir. 1968).  Arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn

12  statements, and prosecution reports pertaining to The defendant are available under Fed. R. Crim.

13  P. 16(a)(1)(A) and (B), Fed. R. Crim. P. 26.2 and 12(I).  Preservation of rough notes is requested,

14  whether or not the government deems them discoverable.

15       3.    *Brady* <u>Material</u>.  The defendant requests all documents, statements, agents' reports, and

16  tangible evidence favorable to her on the issue of guilt and/or that affects the credibility of the

17  government's case.  Impeachment and exculpatory evidence both fall within <u>Brady's</u> definition of

18  evidence favorable to the accused.  <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v.</u>

19  <u>Agurs</u>, 427 U.S. 97 (1976).

20       4.    <u>Any Information That May Result in a Lower Sentence</u>.  As discussed above, any

21  information that may result in a more favorable sentence must also be disclosed pursuant to <u>Brady</u>,

22  373 U.S. 83.  The government must disclose any cooperation or attempted cooperation by the

23  defendant, as well as any information that could affect any base offense level or specific offense

24  characteristic under Chapter Two of the United States Sentencing Commission Guidelines Manual

25  ("Guidelines").  Also included in this request is any information relevant to a Chapter Three

26  adjustment, a determination of the defendant's criminal history, or any other application of the

27  Guidelines.

28       5.    <u>The Defendant's Prior Record</u>.  Evidence of a prior record is available under

1  Fed. R. Crim. P. 16(a)(1)(D).  The defendant specifically requests a complete copy of any criminal

2  record.

3      6.    Any Proposed 404(b) Evidence.  Evidence of prior similar acts is discoverable under

4  Fed. R. Crim. P. 16(a)(1)(D) and Fed. R. Evid. 404(b) and 609.   In addition, under

5  Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable

6  notice in advance of trial . . . of the general nature . . .." of any evidence the government proposes

7  to introduce under Fed. R. Evid. 404(b) at trial.  Sufficient notice requires the government to

8  "articulate *precisely* the evidential hypothesis by which a fact of consequence may be inferred from

9  the other acts evidence." United States v. Mehrmanesh, 689 F.2d 822, 830 (9th Cir. 1982) (emphasis

10  added; internal citations omitted); see also  United States v. Brooke, 4 F.3d 1480, 1483

11  (9th Cir. 1993) (reaffirming Mehrmanesh and reversing convictions).

12      The defendant requests that such notice be given *four weeks before trial* to give the defense

13  time to adequately investigate and prepare for trial.

14      7.    Evidence Seized.  Evidence seized as a result of any search, either warrantless or with

15  a warrant, is discoverable under Fed. R. Crim. P. 16(a)(1)(E).

16      8.    Request for Preservation of Evidence.  The defense specifically requests that all

17  dispatch tapes or any other physical evidence that may be destroyed, lost, or otherwise put out of the

18  possession, custody, or care of the government and that relate to the arrest or the events leading to

19  the arrest in this case be preserved.  This request includes, but is not limited to **the defendant's**

20  **personal effects and any evidence seized from the defendant or any third party**.  This request

21  also includes any material or percipient witnesses who might be deported or otherwise likely to

22  become unavailable.

23      It is requested that the prosecutor be ordered to *question* all the agencies and individuals

24  involved in the prosecution and investigation of this case to determine if such evidence exists, and

25  if it does exist, to inform those parties to preserve any such evidence.

26      9.    Henthorn Material.  The defendant requests that the Assistant United States Attorney

27  ("AUSA") assigned to this case oversee (not personally conduct) a review of all personnel files of

28  each agent involved in the present case for impeachment material.  See Kyles v. Whitley, 514 U.S.

1  437, 438 (1995) (holding that "the individual prosecutor has a duty to learn of any favorable

2  evidence known to the others acting on the government's behalf in the case, including the police");

3  United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991). This request includes, but is not limited to,

4  any complaints filed (by a member of the public, by another agent, or any other person) against the

5  agent, whether or not the investigating authority has taken any action, as well as any matter for which

6  a disciplinary review was undertaken, whether or not any disciplinary action was ultimately

7  recommended. The defendant further requests production of any such information at least *one week*

8  prior to the motion hearing and two weeks prior to trial. If the prosecutor is uncertain whether

9  certain information should be disclosed pursuant to this request, this information should be produced

10  to the Court in advance of the motion hearing and the trial for an *in camera* inspection.

11      10.  <u>Tangible Objects</u>. The defendant requests the opportunity to inspect, copy, and test,

12  as necessary, all other documents and tangible objects, including photographs, books, papers,

13  documents, alleged narcotics, fingerprint analyses, vehicles, or copies of portions thereof, that are

14  material to the defense or intended for use in the government's case-in-chief or were obtained from

15  or belong to The defendant. Fed. R. Crim. P. 16(a)(1)(E).

16      This is not a five-witness border bust case, nor is it even a reasonably common document

17  intensive white collar prosecution. This is a case involving hundreds of thousands of documents;

18  evidence from an undercover operations; and evidence from an executed search warrant. Simply

19  providing the defense with a large volume of discovery and inviting them to find the exculpatory

20  "needle in the haystack" is inconsistent with the fundamental constitutional protections afforded by

21  *Brady*. The government's duty to comply with Rule 16 and *Brady* is not fulfilled, in cases such as

22  this, where the prosecution buries the defendants with discovery.

23      The production of hundreds of thousands of pages of discovery neither satisfies Rule 16 nor

24  Brady. Rule 16 "requires more than a perfunctory invitation to look at the contents of a file." <u>United</u>

25  <u>States v. Pascual</u>, 606 F.2d 561, 565 (5th Cir. 1979). This is true even in cases involving tens of

26  thousands of pages of documents, let alone hundreds of thousands, as is the case here. <u>See United</u>

27  <u>States v. Turkish</u>, 458 F. Supp. 874, 882 (S.D.N.Y. 1978) (Rule 16 not satisfied by "burying the

28  defendant in [approximately 25,000 pages] of paper"); <u>United States v. Poindexter</u>, 727 F. Supp.

1470, 1484 (D.D.C. 1989) ("[B]road brush approach" to discovery – wherein the government identified "several thousand pages, any of which it 'may' rely on at trial" – did not satisfy Rule 16).

Moreover, the government has an "independent duty to identify and disclose <u>Brady</u> material." <u>Lockhart v. McCotter</u>, 782 F.2d 1275, 1282 (5th Cir. 1986).  Granting the accused access to hundreds of thousands of pages of paper and electronic data and inviting them to find the exculpatory "needle in the haystack" is inconsistent with fundamental constitutional protections afforded by <u>Brady</u>.  <u>See</u> <u>United States v. Hsia</u>, 24 F. Supp. 2d 14, 29-30 (D.D.C. 1998).  As the <u>Hsia</u> Court explained:

> The government cannot meet its <u>Brady</u> obligations by providing Ms. Hsia with access to 600,000 documents and then claiming that she should have been able to find the exculpatory information in the haystack.  To the extent that the government knows of any documents or statements that constitute <u>Brady</u> material, it must identify that material to Ms. Hsia.

<u>Id</u>.

Numerous courts are in agreement that merely dumping a large amount of discovery or sending defendants on a fishing expedition for exculpatory materials is far from enough to satisfy <u>Brady</u>.  "[T]he prosecutorial duty to produce exculpatory evidence imposed by <u>Brady</u> may not be discharged by 'dumping' (even in good faith) a voluminous mass of files, tapes, and documentary evidence." <u>Emmett v. Ricketss</u>, 397 F. Supp. 1025, 1043 (N.D. Fa. 1975); <u>see also United States v. Bortnovsky</u>, 820 F.2d 572, 574-575 (2nd Cir. 1987) (holding that "[t]he Government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified or which of some fifteen burglaries would be demonstrated to be staged.")  In short, the production of hundreds of thousands of pages of discovery does not constitute compliance with Rule 16 or <u>Brady</u>.

11.  <u>Expert Witnesses</u>.  The defendant requests the name, qualifications, and a written summary of the testimony of any person that the government intends to call as an expert witness during its case in chief. Fed. R. Crim. P. 16(a)(1)(G).  This summary should include a description of the witness' opinion(s), as well as the bases and the reasons for the opinion(s).  <u>See</u> <u>United States v. W.R. Grace</u>, new cite, *9 (9th Cir., July 12, 2007); <u>United States v. Duvall</u>, 272 F.3d 825 (7th Cir. 2001) (finding that government's written expert notice did not adequately summarize or describe police detective's testimony in drug prosecution where notice provided only a list of the general

1  subject matters to be covered and failed to identify what opinion the expert would offer on those

2  subjects).  This request includes, but is not limited to, disclosure of the qualifications of any

3  government witness who will testify that he understands and/or speaks Spanish or any other foreign

4  language that may have been used during the course of an interview with the defendant or any other

5  witness.

6       The defendant requests the notice of expert testimony be provided at a minimum of *three*

7  *weeks prior to trial* so that the defense can properly prepare to address and respond to this testimony,

8  including obtaining its own expert and/or investigating the opinions, credentials of the government's

9  expert and obtain a hearing in advance of trial to determine the admissibility of qualifications of any

10  expert.  See Kumho v. Carmichael Tire Co., 526 U.S. 137, 119 S. Ct. 1167, 1176 (1999) (trial judge

11  is "gatekeeper" and must determine, reliability and relevancy of expert testimony and such

12  determinations may require "special briefing or other proceedings").

13       12.  Impeachment evidence.  The defendant requests any evidence that any prospective

14  government witness has engaged in any criminal act whether or not resulting in a conviction and

15  whether any witness has made a statement favorable to The defendant.  See Fed. R. Evid. 608, 609

16  and 613.  Such evidence is discoverable under Brady, 373 U.S. 83.  See United States v. Strifler,

17  851 F.2d 1197 (9th Cir. 1988) (witness' prior record); Thomas v. United States, 343 F.2d 49

18  (9th Cir. 1965) (evidence that detracts from a witness' credibility).

19       13.  Evidence of Criminal Investigation of Any Government Witness.  The defendant

20  requests any evidence that any prospective witness is under investigation by federal, state or local

21  authorities for any criminal conduct.  United States v. Chitty, 760 F.2d 425 (2d Cir. 1985).

22       14.  Evidence of Bias or Motive to Lie.  The defendant requests any evidence that any

23  prospective government witness is biased or prejudiced against her, or has a motive to falsify or

24  distort his or her testimony.  Pennsylvania v. Ritchie, 480 U.S. 39 (1987); Strifler, 851 F.2d 1197.

25       15.  Evidence Affecting Perception, Recollection, Ability to Communicate, or Veracity.

26  The defendant requests any evidence, including any medical or psychiatric report or evaluation,

27  tending to show that any prospective witness's ability to perceive, remember, communicate, or tell

28

1  the truth is impaired; and any evidence that a witness has ever used narcotics or other controlled substance,

2  or has ever been an alcoholic.  Strifler, 851 F.2d 1197; Chavis v. North Carolina, 637 F.2d 213, 224

3  (4th Cir. 1980).

4        16.   Witness Addresses.  The defendant requests the name and last known address of each

5  prospective government witness.  See United States v. Napue, 834 F.2d 1311 (7th Cir. 1987);

6  United States v. Tucker, 716 F.2d 576 (9th Cir. 1983) (failure to interview government witnesses

7  by counsel is ineffective); United States v. Cook, 608 F.2d 1175, 1181 (9th Cir. 1979) (defense has

8  equal right to talk to witnesses).  The defendant also requests the name and last known address of

9  every witness to the crime or crimes charged (or any of the overt acts committed in furtherance

10  thereof) who will *not* be called as a government witness.  United States v. Cadet, 727 F.2d 1453

11  (9th Cir. 1984).

12        17.   Name of Witnesses Favorable to the Defendant.  The defendant requests the name of

13  any witness who made any arguably favorable statement concerning her or who could not identify

14  him or who was unsure of his identity or participation in the crime charged.  Jackson v. Wainwright,

15  390 F.2d 288 (5th Cir. 1968); Chavis, 637 F.2d at 223; Jones v. Jago, 575 F.2d 1164,1168

16  (6th Cir. 1978); Hudson v. Blackburn, 601 F.2d 785 (5th Cir. 1979), cert. denied, 444 U.S. 1086

17  (1980).

18        18.   Statements Relevant to the Defense.  The defendant requests disclosure of any

19  statement that may be "relevant to any possible defense or contention" that he might assert.  United

20  States v. Bailleaux, 685 F.2d 1105 (9th Cir. 1982).  This includes grand jury transcripts that are

21  relevant to the defense motion to dismiss the indictment.

22        19.   Jencks Act Material.  The defendant requests production in advance of the motion

23  hearing or trial of all material, including dispatch tapes, that the government must produce pursuant

24  to the Jencks Act, 18 U.S.C. § 3500 and Fed. R. Crim. P. 26.2.  A verbal acknowledgment that

25  "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or

26  notes to qualify as a statement under section 3500(e)(1).  Campbell v. United States, 373 U.S. 487,

27  490-92 (1963); see also United States v. Boshell, 952 F.2d 1101 (9th Cir. 1991) (holding that

28  interview notes constitutes Jencks material when an agent reviews notes with the subject of the

1    interview); see also United States v. Riley, 189 F.3d 802, 806-808 (9th Cir. 1999).   Advance

2    production will avoid the possibility of delay of the motion hearing or trial to allow The defendant

3    to investigate the Jencks material.  The defendant requests pre-trial disclosure of such statements to

4    avoid unnecessary recesses and delays and to allow defense counsel to prepare for, and use properly

5    any Jencks statements during cross-examination.

6         20.   Giglio Information.  Pursuant to Giglio v. United States, 405 U.S. 150 (1972), The

7    defendant requests all statements and/or promises, expressed or implied, made to any government

8    witnesses, in exchange for their testimony in this case, and all other information that could arguably

9    be used for the impeachment of any government witnesses.

10        21.   Agreements Between the Government and Witnesses.   The defendant requests

11   discovery regarding any express or implicit promise, understanding, offer of immunity, of past,

12   present, or future compensation, or any other kind of agreement or understanding, including any

13   implicit understanding relating to criminal or civil income tax, forfeiture or fine liability, between

14   any prospective government witness and the government (federal, state and/or local).  This request

15   also includes any discussion with a potential witness about or advice concerning any immigration

16   benefits, any contemplated prosecution, or any possible plea bargain, even if no bargain was made

17   or the advice not followed.

18        22.   Informants and Cooperating Witnesses.  The defendant requests disclosure of the

19   names and addresses of all informants or cooperating witnesses used or to be used in this case, and

20   in particular, disclosure of any informant who was a percipient witness in this case or otherwise

21   participated in the crime charged against the defendant.   The government must disclose the

22   informant's identity and location, as well as disclose the existence of any other percipient witness

23   unknown or unknowable to the defense.  Roviaro v. United States, 353 U.S. 52, 61-62 (1957).  The

24   government must disclose any information derived from informants that exculpates or tends to

25   exculpate the defendant.

26        23.   Bias by Informants or Cooperating Witnesses.  The defendant requests disclosure of

27   any information indicating bias on the part of any informant or cooperating witness.  Giglio, 405

28   U.S. 24.  Such information would include what, if any, inducements, favors, payments or threats

1    were made to the witness to secure cooperation with the authorities.

2        24.    <u>Personnel Records of Government Officers Involved in the Arrest</u>.  The defendant

3    requests all citizen complaints and other related internal affairs documents involving any of the

4    immigration officers or other law enforcement officers who were involved in the investigation, arrest

5    and interrogation of the defendant.  <u>See</u> <u>Pitchess v. Superior Court</u>, 11 Cal. 3d 531, 539 (1974).

6    Because of the sensitive nature of these documents, defense counsel will be unable to procure them

7    from any other source.

8        25.    <u>Training of Relevant Law Enforcement Officers</u>.  The defendant requests copies of all

9    written videotaped or otherwise recorded policies or training instructions or manuals issued by all

10   law enforcement agencies involved in the case (United States Customs Service, Border Patrol, INS,

11   Department of Homeland Security, etc.) to their employees regarding:  (a) the handling of vehicles

12   suspected to be transporting contraband across the port of entry; (b) the referral to secondary

13   inspection of persons within those vehicles; (c) the detention of individuals within those vehicles;

14   (d) the search of those vehicles and the occupants of those vehicles, including the proper means of

15   obtaining consent to search and what constitutes consent to search; (e) the informing of suspects of

16   their Constitutional rights; (f) the questioning of suspects and witnesses.  The defendant also requests

17   all written or otherwise attainable information regarding the training of Customs agents at ports of

18   entry in California to detect or discover contraband in vehicles entering the United States, including

19   any training offered to Border Patrol, INS, or officers of Homeland Security Department, by the DEA

20   or other law enforcement agencies or individuals.

21       26.    <u>Performance Goals and Policy Awards</u>.  The defendant requests disclosure of

22   information regarding standards used for measuring, compensating or reprimanding the conduct of

23   all law enforcement officers involved in the case (Customs, Border Patrol, INS, etc.) to the extent

24   such information relates to the detection of contraband.  This request specifically includes

25   information concerning performance goals, policy awards, and the standards used by Customs for

26   commending, demoting, or promoting agents for their performance at the port of entry and their

27   success or failure to detect illegal narcotics in general.

28   / / /

27.    <u>Reports of Scientific Tests or Examinations</u>.  Pursuant to Fed. R. Crim. P. 16(a)(1)(F), The defendant requests disclosure and the opportunity to inspect, copy, and photograph the results and reports of all tests, examinations, and experiments conducted upon the evidence in this case, including, but not limited to, any fingerprint testing done upon any evidence seized in this case, that is within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, and that are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.

28.    <u>Brady Information</u>.  The defendant requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the government's case.  Under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused. <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976).

29.    <u>Any Proposed 404(b) Evidence</u>.  The government must produce evidence of prior similar acts under Fed. R. Crim. P. 16(a)(1) and Fed. R. Evid. 404(b) and any prior convictions which would be used to impeach as noted in Fed. R. Crim. P. 609.  In addition, under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature" of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial.  The defendant requests notice two weeks before trial to give the defense time to investigate and prepare for trial.

30.    <u>Specific Requests</u>.  The defendant specifically requests the opportunity to view the "A-File" of the material witness in this case.  She also specifically requests all reports and documentation relating to prior apprehensions of the material witness.

31.    <u>Residual Request</u>.  The defendant intends by this discovery motion to invoke her rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States.

/ / /

/ / /

**III.**

**<u>MOTION TO SUPPRESS STATEMENTS</u>**

At this time, the defendant is unaware of any statements that the government may seek to introduce at trial.  If the government intends to introduce any of the defendant's purported statements, she moves to suppress them.  Prior to introducing such statements at trial, the government must demonstrate compliance with <u>Miranda</u> and that any such statements were voluntary.

**A.    The Government Must Demonstrate Compliance with <u>Miranda</u>.**

In order for any statements made by Ms. Garrett to be admissible against her, the government must demonstrate that they were obtained in compliance with <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).  Specifically, the government must establish that the defendant waived her rights and that any waiver of her <u>Miranda</u> rights was voluntary, knowing, and intelligent.  <u>See</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973).  When an interrogation continues without the presence of an attorney, and a statement results, the government has a heavy burden to demonstrate that the defendant has intelligently and voluntarily waived his privilege against self-incrimination.  <u>Miranda</u>, 384 U.S. at 475.  The court must indulge every reasonable presumption against waiver of fundamental constitutional rights, so the burden on the government is great.  <u>United States v. Heldt</u>, 745 F. 2d 1275, 1277 (9th Cir. 1984).

In determining whether a waiver is voluntary, knowing, and intelligent, the court looks to the totality of the circumstances surrounding the case.  <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981); <u>United States v. Garibay</u>, 143 F.3d 534 (9th Cir. 1998).  The Ninth Circuit has held that determination of the validity of a <u>Miranda</u> waiver requires a two prong analysis:  the waiver must be both (1) voluntary and (2) knowing and intelligent.  <u>Derrick v. Peterson</u>, 924 F. 2d 813 (9th Cir. 1990).  The second prong requires an inquiry into whether "the waiver [was] made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."  <u>Id.</u> at 820-821 (quoting <u>Colorado v. Spring</u>, 479 U.S. 564, 573 (1987)).  Not only must the waiver be uncoerced, then, it must also involve a "requisite level of comprehension" before a court may conclude that <u>Miranda</u> rights have been legitimately waived.  <u>Id.</u> (quoting <u>Colorado v. Spring</u>, 479

13                                08CR0918-L

1   U.S. at 573).  Unless and until <u>Miranda</u> warnings and a knowing and intelligent waiver are

2   demonstrated by the prosecution, no evidence obtained as a result of the interrogation can be used

3   against the defendant.  <u>Miranda</u>, 384 U.S. at 479.  The government in this case must prove that the

4   defendant waived her rights intelligently and voluntarily.  The defendant disputes any allegation that

5   any waiver was knowing, intelligent, and voluntarily.

6   **B.    The Defendant's Statements Must Be Voluntary.**

7           Even if this Court determines that Ms. Garrett validly waived her <u>Miranda</u> rights, it must still

8   make a determination that any statements are voluntary.  Under 18 U.S.C. § 3501(a), this Court is

9   required to determine, whether any statements made by Ms. Garrett are voluntary.  In addition,

10  section 3501(b) requires this Court to consider various enumerated factors, including whether Ms.

11  Garrett understood the nature of the charges against her and whether she understood her rights.

12  Without such evidence, this Court cannot adequately consider these statutorily mandated factors.

13          Moreover, section 3501(a) requires this Court to make a factual determination.  Where a

14  factual determination is required, Fed. R. Crim. P. 12 obligates courts to make factual findings.  <u>See</u>

15  <u>United States v. Prieto-Villa</u>, 910 F.2d 601, 606-10 (9th Cir. 1990).  Because "'suppression hearings

16  are often as important as the trial itself,'" <u>id.</u> at 610 (quoting <u>Waller v. Georgia</u>, 467 U.S. 39, 46

17  (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation

18  of purported evidence in a prosecutor's responsive pleading.  Therefore, prior to admitting any

19  alleged statements from Ms. Garrett, a hearing must be held to determine whether the statements

20  were voluntary.

21                                          **IV.**

22          **SUPPRESS ALL EVIDENCE SEIZED IN VIOLATION OF THE FOURTH**
                                    **AMENDMENT**
23
            The Fourth Amendment  prohibits "unreasonable" searches and seizures.  U.S. CONST.
24
    Amend. IV; <u>Terry v. Ohio</u>, 392 U.S. 1, 20-21 (1968). The test of whether a seizure is reasonable
25
    entails a balancing of the governmental interest that justifies the intrusion against the individual's
26
    privacy expectations and interests.  <u>See</u> <u>Ferguson v. City of Charleston</u>, 532 U.S. 67, 84 n.21 (2001);
27
    <u>see also</u> <u>Mich. Dep't of State Police v. Sitz</u>, 496 U.S. 444, 448-49 (1990).  In this case, the
28
    government must prove the seizure of any evidence did not implicate the defendant's Fourth

1  Amendment rights.  The defendant specifically challenges the validity of the search warrant affidavit

2  prepared by Special Agent Len Bradley, the search warrant itself, and the subsequent execution of

3  the search warrant at her home and place of business.  The defendant further moves to suppress all

4  outdated evidence – documentary and otherwise – because it is obsolete, confusing, and wastes time.

5
                                                      **V.**

6
**THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S**
7  **INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY**
   **RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE**
8  **FIFTH AMENDMENT BY DEPRIVING THE DEFENDANT OF THE TRADITIONAL**
                              **FUNCTIONING OF THE GRAND JURY**
9
**A.    Introduction.**
10
              The indictment in the instant case was returned by the January 2007 grand jury.  That grand
11
   jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January
12
   11, 2007.  See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of
13
   which is attached hereto as Exhibit A.  Judge Burns's instructions to the impaneled grand jury deviate
14
   from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury
15
   instruction previously given in this district in several ways.[2]  These instructions compounded Judge
16
   Burns's erroneous instructions and comments to prospective grand jurors during voir dire of the
17
   grand jury panel, which immediately preceded the instructions at Ex. A.  See Reporter's Transcript
18
   of Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B.
19
          **1.     Judge Burns Instructed Grand Jurors That Their Singular Duty Is**
20                 **to Determine Whether or Not Probable Cause Exists and That They**
                   **Have No Right to Decline to Indict When the Probable Cause**
21                 **Standard Is Satisfied.**

22
              After repeatedly emphasizing to the grand jurors that probable cause determination was their
23
   sole responsibility, see Ex. A at 3, 3-4, 5,[3] Judge Burns instructed the grand jurors that they were
24

25  _____

26      [2]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v.
    Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-
27  Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United
    States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).
28
        [3]  See also id. at 20 ("You're all about probable cause.").

1   forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or

2   not there should be a federal law or should not be a federal law designating certain activity [as]

3   criminal is not up to you." See id. at 8.  The instructions go beyond that, however, and tell the grand

4   jurors that, should "you disagree with that judgment made by Congress, then your option is not to

5   say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or

6   'I'm going to vote in favor of even though the evidence may be insufficient.'"  See id. at 8-9.  Thus,

7   the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree

8   with a proposed prosecution.

9           Immediately before limiting the grand jurors' powers in the way just described, Judge Burns

10  referred to an instance in the grand juror selection process in which he excused three potential jurors.

11  See id. at 8.

12          I've gone over this with a couple of people.  You understood from the questions and
            answers that a couple of people were excused, I think three in this case, because they
13          could not adhere to the principle that I'm about to tell you.

14  Id.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

15  disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors

16  on his view of their discretion; he enforced that view on pain of being excused from service as a

17  grand juror.

18          Examination of the recently disclosed voir dire transcript, which contains additional

19  instructions and commentary in the form of the give and take between Judge Burns and various

20  prospective grand jurors, reveals how Judge Burns's emphasis of the singular duty is to determine

21  whether or not probable cause exists and his statement that grand jurors they cannot judge the

22  wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of

23  instructions already given to the grand jury venire.  In one of his earliest substantive remarks, Judge

24  Burns makes clear that the grand jury's sole function is probable cause determination.

25          [T]he grand jury is determining really two factors: "do we have a reasonable belief
            that a crime was committed?  And second, do we have a reasonable belief that the
26          person that they propose that we indict committed the crime?"

27          If the answer is "yes" to both of those, then the case should move forward.  If the
            answer to either of the questions is "no," then the grand jury should not hesitate and
28          not indict.

<u>See</u> Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was committed" or if it has no "reasonable belief that the person that they propose that we indict committed the crime."

Equally revealing are Judge Burns's interactions with two potential grand jurors who indicated that, in some unknown set of circumstances, they might decline to indict even where there was probable cause.  Because of the redactions of the grand jurors' names, Mr. Santana will refer to them by occupation.  One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA).  The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of resources.  <u>See id.</u> at 16.  The CSW was also troubled by certain unspecified immigration cases.  <u>See id.</u>

Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the CSW.  He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.  Rather, he provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not capable of expression in the context of grand jury service.

> Now, the question is can you fairly evaluate [drug cases and immigration cases]?
> Just as the defendant is ultimately entitled to a fair trial and the person that's accused
> is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too,
> is the United States entitled to a fair judgment.  If there's probable cause, then the
> case should go forward.  *I wouldn't want you to say,* "well, yeah, there's probable
> cause, but I still don't like what our government is doing.  I disagree with these laws,
> so I'm not going to vote for it to go forward."  If that is your frame of mind, the
> probably you shouldn't serve.  Only you can tell me that.

<u>See id.</u> at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge Burns let the grand juror know that he would not want him or her to decline to indict in an individual case where the grand juror "[didn't] like what our government is doing," <u>see id.</u> at 17, but in which there was probable cause.  <u>See Id.</u>  Such a case "should go forward."  <u>See id.</u>  Given that blanket proscription on grand juror discretion, made manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the evidence

1  warranted it." See id.  Again, Judge Burns's question provided no context; he inquired regarding "a

2  case," a term presumably just as applicable to possession of a small amount of medical marijuana

3  as kilogram quantities of methamphetamine for distribution.  Any grand juror listening to this

4  exchange could only conclude that there was *no* case in which Judge Burns would permit them to

5  vote "no bill" in the face of a showing probable cause.

6      Just in case there may have been a grand juror that did not understand his or her inability to

7  exercise anything like prosecutorial discretion, Judge Burns drove the point home in his exchange

8  with REA.  REA first advised Judge Burns of a concern regarding the "disparity between state and

9  federal law" regarding "medical marijuana."  See id. at 24.  Judge Burns first sought to address

10  REA's concerns about medical marijuana by stating that grand jurors, like trial jurors, are simply

11  forbidden from taking penalty considerations into account.

> Well, those things -- the consequences of your determination shouldn't concern you
> in the sense that penalties or punishment, things like that -- we tell trial jurors, of
> course, that they cannot consider the punishment or the consequence that Congress
> has set for these things.  We'd ask you to also abide by that.  We want you to make
> a business-like decision of whether there was a probable cause. . . .

15  Id. at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors, Judge

16  Burns went on to suggest that REA recuse him or herself from medical marijuana cases.  See id. at

17  25.

18      In response to further questioning, REA disclosed REA's belief "that drugs should be legal."

19  See id.  That disclosure prompted Judge Burns to begin a discussion that ultimately led to an

20  instruction that a grand juror is obligated to vote to indict if there is probable cause.

> I can tell you sometimes I don't agree with some of the legal decisions that are
> indicated that I have to make.  But my alternative is to vote for someone different,
> vote for someone that supports the policies I support and get the law changed.  It's not
> for me to say, "well, I don't like it.  So I'm not going to follow it here."
>
> You'd have a similar obligation as a grand juror even though you might have to grit
> your teeth on some cases.  Philosophically, if you were a member of congress, you'd
> vote against, for example, criminalizing marijuana.  I don't know if that's it, but you'd
> vote against criminalizing some drugs.
>
> That's not what your prerogative is here.  You're prerogative instead is to act like a
> judge and say, "all right.  This is what I've to  deal with objectively.  Does it seem to
> me that a crime was committed?  Yes.  Does it seem to me that this person's
> involved?  It does."  *And then your obligation, if you find those to be true, would be
> to vote in favor of the case going forward.*

1  Id. at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part test,

2  which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

3            Having set forth the duty to indict, and being advised that REA was "uncomfortable" with

4  that paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the

5  obligation to indict in every case in which there was probable cause.

6            The Court: Do you think you'd be inclined to let people go in drug cases even though
          you were convinced there was probable cause they committed a drug offense?
7          REA: It would depend on the case.
          The Court: Is there a chance that you would do that?
8          REA: Yes.
          The Court: I appreciate your answers.  I'll excuse you at this time.
9

10  Id. at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely

11  on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case,"

12  see id., as it should.  Because REA's vote "depend[s] on the case," see id., it is necessarily true that

13  REA would vote to indict in some (perhaps many or even nearly all) cases in which there was

14  probable cause.  Again, Judge Burns made no effort to explore REA's views; he did not ascertain

15  what sorts of cases would prompt REA to hesitate.  The message is clear: it does not matter what

16  type of case might prompt REA's reluctance to indict because, once the two part test is satisfied, the

17  "obligation" is "to vote in favor of the case going forward."[4]  See id. at 27.  That is why even the

18  "chance," see id., that a grand juror might not vote to indict was too great a risk to run.

19       **2.    The Instructions Posit a Non-Existent Prosecutorial Duty to Offer
            Exculpatory Evidence.**

20

21            In addition to his instructions on the authority to choose not to indict, Judge Burns also

22  assured the grand jurors that prosecutors would present to them evidence that tended to undercut

23

24

---

25       [4]  This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate

26  judge will have determined the existence of probable cause "in most circumstances" before it has
   been presented with any evidence.  See Ex. A at 6.  This instruction created an imprimatur of finding

27  probable cause in each case because had a magistrate judge not so found, the case likely would not
   have been presented to the Grand Jury for indictment at all.  The Grand Jury was informed that it

28  merely was redundant to the magistrate court "in most circumstances."  See id.  This instruction
   made the grand jury more inclined to indict irrespective of the evidence presented.

probable cause.  See Ex. A at 20.[5]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury.  You're all about probable cause.  If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire.  After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that.  They have a duty to do that."  See id.  Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was "adverse" or "that cuts against the charge."  See

---

[5] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general.  Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you."  See Ex. A at 27.  The instructions delivered during voir dire go even further.  In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying.  They make sense to me."  See id. at 43.  See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys.  See Ex. A at 9-10. Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, he would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked."  See Ex. A at 12.  As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215.  The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court.  See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

1  id.

2  **B.      Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the**
3          **Powers of the Grand Jury, Which Judge Burns Far Exceeded in His**
        **Instructions as a Whole During Impanelment.**

4           The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions

5  given to grand jurors in the Southern District of California.  See Navarro-Vargas II, 408 F.3d 1184.

6  While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of

7  adopting a highly formalistic approach[6] to the problems posed by the instructions, endorsed many

8  of the substantive arguments raised by the defendants in those cases.  The district court's instructions

9  cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II.  Taken

10 together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those

11 at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential grand

12 jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-

13 prosecutorial discretion.  That is not the institution the Framers envisioned.  See United States v.

14 Williams, 504 U.S. 36, 49 (1992).

15          For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-

16 Vargas II majority acknowledges that the two institutions perform similar functions: "'the public

17 prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs

18 much the same function as a grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v.

19 Economou, 438 U.S. 478, 510 (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900

20 (9th Cir. 2004) (Navarro-Vargas I)(Kozinski, J., dissenting) (The grand jury's discretion in this

21 regard "is most accurately described as prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at

22 1213 (Hawkins, J., dissenting).  It recognizes that the prosecutor is not obligated to proceed on any

23 indictment or presentment returned by a grand jury, id., but also that "the grand jury has no

24 obligation to prepare a presentment or to return an indictment drafted by the prosecutor."  Id.  See

25 Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional Function of the Federal

26  ─────────────

27      [6]  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the
28 majority because "[t]he instruction's use of the word 'should' is most likely to be understood as
   imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's
   constitutional independence.").

1  Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably

2  . . . the most important attribute of grand jury review from the perspective of those who insisted that

3  a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal

4  Procedure § 15.2(g) (2d ed. 1999)).

5      Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes

6  set forth in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

7      The grand jury thus determines not only whether probable cause exists, but also
        whether to "charge a greater offense or a lesser offense; numerous counts or a single
8      count; and perhaps most significant of all, a capital offense or a non-capital offense --
        all on the basis of the same facts.  And, significantly, the grand jury may refuse to
9      return an indictment even "'where a conviction can be obtained.'"

10 Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's

11 description of the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that

12 the grand jury "controls not only the initial decision to indict, but also significant questions such as

13 how many counts to charge and whether to charge a greater or lesser offense, including the important

14 decision whether to charge a capital crime."  Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge

15 Hawkins notes that the Navarro-Vargas II majority accepts the major premise of Vasquez: "the

16 majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor

17 has established probable cause that this individual has committed a crime."  See id. at 1214

18 (Hawkins, J. dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J., dissenting);

19 United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J.,

20 dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth

21 Circuit.  But not in Judge Burns's instructions.

22 **C.**    **Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion**
           **Established in Both *Vasquez* and *Navarro-Vargas II*.**
23

24     The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the

25 grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its

26 previous decision in Marcucci.  Marcucci reasoned that the instructions do not mandate that grand

27 jurors indict upon every finding of probable cause because the term "should" may mean "what is

28 probable or expected."  299 F.3d at 1164 (citation omitted).  That reading of the term "should" makes

1   no sense in context, as Judge Hawkins ably pointed out.  See Navarro-Vargas II, 408 F.3d at 1210-11

2   (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be understood

3   as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand

4   jury's constitutional independence.").  See also id. ("The 'word' should is used to express a duty [or]

5   obligation.") (quoting The Oxford American Diction and Language Guide 1579 (1999) (brackets in

6   original)).

7         The debate about what the word "should" means is irrelevant here; the instructions here make

8   no such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply

9   may not choose not to indict in the event of what appears to them to be an unfair application of the

10  law: should "you disagree with that judgment made by Congress, then your option is not to say 'well,

11  I'm going to vote against indicting even though I think that the evidence is sufficient'...."  See Ex. A

12  at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict because they disagree

13  with a proposed prosecution.  No grand juror would read this language as instructing, or even

14  allowing, him or her to assess "the need to indict."  Vasquez, 474 U.S. at 264.

15        While Judge Burns used the word "should" instead of "shall" during voir dire with respect

16  to whether an indictment was required if probable cause existed, see Ex. B at 4, 8, n context, it is

17  clear that he could only mean "should" in the obligatory sense.  For example, when addressing a

18  prospective juror, Judge Burns not only told the jurors that they "should" indict if there is probable

19  cause, he told them that if there is not probable cause, "then the grand jury should hesitate and not

20  indict."  See id. at 8.  At least in context, it would strain credulity to suggest that Judge Burns was

21  using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds [no]

22  probable cause."  See Navarro-Vargas, 408 F.3d at 1205.  Clearly he was not.

23        The full passage cited above effectively eliminates any possibility that Judge Burns intended

24  the Navarro-Vargas spin on the word "should."

25        [T]he grand jury is determining really two factors: "do we have a reasonable belief
         that a crime was committed?  And second, do we have a reasonable belief that the
26       person that they propose that we indict committed the crime?"

27       If the answer is "yes" to both of those, then the case should move forward.  If the
         answer to either of the questions is "no," then the grand jury should not hesitate and
28       not indict.

1

2    See Ex. B at 8. Of the two sentences containing the word "should," the latter of the two essentially

3    states that if there is no probable cause, you *should* not indict. Judge Burns could not possibly have

4    intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause." See

5    Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159). That would contravene the

6    grand jury's historic role of protecting the innocent. See, e.g., United States v. Calandra, 414 U.S.

7    338, 343 (1974) (The grand jury's "responsibilities continue to include both the determination

8    whether there is probable cause and the protection of citizens against unfounded criminal

9    prosecutions.") (citation omitted).

10           By the same token, if Judge Burns said that "the case should move forward" if there is

11   probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable

12   cause," see Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would

13   have to have intended two different meanings of the word "should" in the space of two consecutive

14   sentences. That could not have been his intent. But even if it were, no grand jury could ever have

15   had that understanding.[7] Jurors are not presumed to be capable of sorting through internally

16   contradictory instructions. See generally United States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995)

17   ("where two instructions conflict, a reviewing court cannot presume that the jury followed the correct

18   one") (citation, internal quotations and brackets omitted).

19           Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it

20   explicitly clear to the grand jurors that "should" was not merely suggestive, but obligatory:

21           **(1)**     The first occasion occurred in the following exchange when Judge Burns conducted

22   voir dire and excused a potential juror (CSW):

23           The Court: . . . If there's probable cause, then the case should go forward. I wouldn't
             want you to say, "Well, yeah, there's probable cause. But I still don't like what the
24           government is doing. I disagree with these laws, so I'm not going to vote for it to go
             forward." If that's your frame of mind, then probably you shouldn't serve. Only you
25           can tell me that.
             Prospective Juror: Well, I think I may fall in that category.
26           The Court: In the latter category?

27           [7] This argument does not turn on The defendant's view that the Navarro-Vargas/Marcucci
28   reading of the word "should" in the model instructions is wildly implausible. Rather, it turns on the
     context in which the word is employed by Judge Burns in his unique instructions, context which
     eliminates the Navarro-Vargas/Marcucci reading as a possibility.

1    Prospective Juror: Yes.
     The Court: Where it would be difficult for you to support a charge even if you
2    thought the evidence warranted it?
     Prospective Juror: Yes.
3    The Court: I'm going to excuse you then.

4    See Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a

5    prospective juror.  Even if the prospective juror did not like what the government was doing in a

6    particular case, that case "should go forward" and Judge Burns expressly disapproved of any vote

7    that might prevent that.  See id. ("I wouldn't want you [to vote against such a case]").  The sanction

8    for the possibility of independent judgment was dismissal, a result that provided full deterrence of

9    that juror's discretion and secondary deterrence as to the exercise of discretion by any other

10   prospective grand juror.

11        **(2)**    In an even more explicit example of what "should" meant, Judge Burns makes clear

12   that it there is an unbending obligation to indict if there is probable cause.  Grand jurors have no

13   other prerogative.

14   Court  . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."

15        You'd have a similar *obligation* as a grand juror even though you might have to grit
          your teeth on some cases.  Philosophically, if you were a member of Congress, you'd
16        vote against, for example, criminalizing marijuana.  I don't know if that's it, but you'd
          vote against criminalizing some drugs.
17
          That's not what your *prerogative* is here.  Your prerogative instead is act like a judge
18        and to say, "All right.  This is what I've got to deal with objectively.  Does it seem to
          me that a crime was committed?  Yes.  Does it seem to me that this person's
19        involved?  It does."  *And then your obligation, if you find those things to be true,
          would be to vote in favor of the case going forward.*
20

21   Id. at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and

22   prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases

23   even though you were convinced there was probable cause they committed a drug offense?" Id. at

24   27.  The potential juror responded: "It would depend on the case." Id.  Nevertheless, that juror was

25   excused.  Id. at 28.  Again, in this context, and contrary to the situation in Navarro-Vargas, "should"

26   means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if

27   there is probable cause.

28        Moreover, as this example demonstrates, the issue is not limited to whether the grand jury

                                        25                        08CR0918-L

believes a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case."  Thus, it is clear that Judge Burns's point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual scenarios, perhaps many.  But Judge Burns did not pursue the question of what factual scenarios troubled the prospective jurors, because his message is that there is no discretion not to indict.

(3)    As if the preceding examples were not enough, Judge Burns continued to pound the point home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws here."  See id. at 61.

(4)    And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting."  See Ex. A at 9.

Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the penalties to which indicted persons may be subject.

> Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law.
> The Court:  In what regard?
> Prospective Juror: Specifically, medical marijuana.
> The Court:  Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things.  We'd ask you to also abide by that.*  We want you to make a business-like decision of whether there was a probable cause. ...

See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause" would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should"

1    employed in Marcucci.  See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).

2    Cortez-Rivera is inapposite for two reasons.  First, Judge Burns did not use the term "should" in the

3    passage quoted above.  Second, that context, as well as his consistent use of a mandatory meaning

4    in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera.

5    The instructions again violate Vasquez, which plainly authorized consideration of penalty

6    information.  See 474 U.S. at 263.

7           Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time

8    and time again that they had a duty, an obligation, and a singular prerogative to indict each and every

9    case where there was probable cause.  These instructions go far beyond the holding of Navarro-

10   Vargas and stand in direct contradiction of the Supreme Court's decision in Vasquez.  Indeed, it

11   defies credulity to suggest that a grand juror hearing these instructions, and that voir dire, could

12   possibly believe what the Supreme Court held in Vasquez:

13           The grand jury does not determine only that probable cause exists to believe that a
             defendant committed a crime, or that it does not.  In the hands of the grand jury lies
14           the power to charge a greater offense or a lesser offense; numerous counts or a single
             count; and perhaps most significant of all, a capital offense or a non-capital offense –
15           all on the basis of the same facts.  Moreover, "[t]he grand jury is not bound to indict
             in every case where a conviction can be obtained."

16   474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly,

17   J., dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls

18   not only the initial decision to indict, but also significant decisions such as how many counts to

19   charge and whether to charge a greater or lesser offense, including the important decision whether

20   to charge a capital crime.").  Nor would the January 2007 grand jury ever believe that it was

21   empowered to assess the "the need to indict." See id. at 264.  Judge Burns's grand jury is not

22   Vasquez's grand jury.  The instructions therefore represent structural constitutional error "that

23   interferes with the grand jury's independence and the integrity of the grand jury proceeding." See

24   United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992).  The indictment must therefore be

25   dismissed. Id.

26          The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the

27   instructions excesses.  The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

28   independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

1   decisions." 408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's instructions

2   may have on a grand jury because "it is the *structure* of the grand jury process and its *function* that

3   make it independent." Id. at 1202 (emphases in the original).

4           Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the

5   'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and

6   unreviewability of many of its decisions -- sufficiently protects that power."  See id. at 1214

7   (Hawkins, J., dissenting).  The flaw in the majority's analysis is that "[i]nstructing a grand jury that

8   it lacks power to do anything beyond making a probable cause determination ... unconstitutionally

9   undermines the very structural protections that the majority believes save[] the instruction." Id.

10  After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'" Id.

11  (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).  If that "invariable assumption" were to

12  hold true, then the grand jurors could not possibly fulfill the role described in Vasquez.  Indeed,

13  "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions

14  because nothing will happen if they disobey them." Id.

15          In setting forth Judge Hawkins' views, Mr. Santana understands that this Court may not adopt

16  them solely because the reasoning that supports them is so much more persuasive than the majority's

17  sophistry.  Rather, he sets them forth to urge the Court *not to extend* what is already untenable

18  reasoning.

19          Here, again, the question is not an obscure interpretation of the word "should", especially in

20  light of the instructions and commentary by Judge Burns during voir dire discussed above -

21  unaccounted for by the Court in Navarro-Vargas II because they had not yet been disclosed to the

22  defense, but an absolute ban on the right to refuse to indict that directly conflicts with the recognition

23  of that right in Vasquez, Campbell, and both Navarro-Vargas II opinions.  Navarro-Vargas II is

24  distinguishable on that basis, but not only that.

25          Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly

26  states they enjoy.  He also excused prospective grand jurors who might have exercised that Fifth

27  Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that]

28  principle...."  See Ex. A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its

1    deliberations cannot embolden grand jurors who are no longer there, likely because they expressed

2    their willingness to act as the conscience of the community.  See Navarro-Vargas II, 408 F.3d at

3    1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under Vasquez "serves ... to

4    protect the accused from the other branches of government by acting as the 'conscience of the

5    community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)).  The

6    federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand

7    jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both

8    fashioned his own rules and enforced them.

9    **D.      The Instructions Conflict with Williams' Holding That There Is No Duty to**
         **Present Exculpatory Evidence to the Grand Jury.**
10

11        In Williams, the defendant, although conceding that it was not required by the Fifth

12    Amendment, argued that the federal courts should exercise their supervisory power to order

13    prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure

14    required by Fifth Amendment common law.  See 504 U.S. at 45, 51.  Williams held that "as a

15    general matter at least, no such 'supervisory' judicial authority exists."  See id. at 47.  Indeed,

16    although the supervisory power may provide the authority "to dismiss an indictment because of

17    misconduct before the grand jury, at least where that misconduct amounts to a violation of one of

18    those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to

19    ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it does not serve as "a

20    means of *prescribing* such standards of prosecutorial conduct in the first instance."  Id. at 47

21    (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

22    initiative, rules of grand jury procedure."  Id. at 50.  As a consequence, Williams rejected the

23    defendant's claim, both as an exercise of supervisory power and as Fifth Amendment common law.

24    See id. at 51-55.

25        Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors

26    would present to them evidence that tended to undercut probable cause.  See Ex. A at 20.

27        Now, again, this emphasizes the difference between the function of the grand jury
         and the trial jury.  You're all about probable cause.  If you think that there's evidence
         out there that might cause you say "well, I don't think probable cause exists," then it's
28        incumbent upon you to hear that evidence as well.  As I told you, in most instances,

1    *the U.S. Attorneys are duty-bound to present evidence that cuts against what they*
2    *may be asking you to do if they're aware of that evidence.*

3    Id. (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and
4    their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear
5    in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters
6    presented to you."  See id. at 27.  The Ninth Circuit has already concluded it is likely this final
7    comment is "unnecessary."  See Navarro-Vargas, 408 F.3d at 1207.

8        This particular instruction has a devastating effect on the grand jury's protective powers,
9    particularly if it is not true.  It begins by emphasizing the message that Navarro-Vargas II somehow
10    concluded was not conveyed by the previous instruction: "You're all about probable cause."  See Ex.
11    A at 20.  Thus, once again, the grand jury is reminded that they are limited to probable cause
12    determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had
13    already told the grand jurors that they likely would be excused if they rejected this limitation).  The
14    instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable
15    cause, but also advises the grand jurors that the prosecutor will present it.  The end result, then, is
16    that grand jurors should consider evidence that goes against probable cause, but, if none is presented
17    by the government, they can  presume that there is none.  After all, "in most instances, the U.S.
18    Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do
19    if they're aware of that evidence."  See id.  Moreover, during voir dire, Judge Burns informed the
20    jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's something
21    adverse or that cuts against the charge, you'll be informed of that.  *They have a duty to do that*."  See
22    Ex. B at 14-15 (emphasis added).  Thus, if the exculpatory evidence existed, it necessarily would
23    have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the
24    U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act
25    in good faith in all matters presented to you."  See Ex. A at 27.

26        These instructions create a presumption that, in cases where the prosecutor does not present
27    exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which
28    no exculpatory evidence was presented, would proceed along these lines:

(1)    I have to consider evidence that undercuts probable cause.

(2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

(3)    Because no such evidence was presented to me, I may conclude that there is none. Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

## VI.

### MOTION TO DISMISS THE INDICTMENT
### DUE TO UNDUE DELAY IN FILING THE CHARGES

**A.    18 U.S.C. 7602(2) Charges: Tax Years 2001 and 2002**

Reasons for dismissal of 18 U.S.C. § 7602(2) (aiding and assisting the preparation of false tax  for tax years 2001 and 2002):

**1.    Undue Delay: Fifth Amendment Due Process Violation**

These charges are old.  It was known to the IRS CID since March 2002, about six years ago, when CID received a detailed information from a competitor tax preparer.[8]  The administrative investigation was officially opened in January 2003, over five years ago.  Then, sometime in early December 2003, my two offices were searched by a group of CID, wearing jackets with special agents back tags (IRS special agents).  The computers, including crashed computers, and records were confiscated.

Sometime in May 2005, my two lawyers and I had a conference with the IRS lawyers and his

---

[8] The information above is taken from the Probable Cause Affidavit to support the search warrant, signed by Special Agent Len Bradley.

1    teammates.  I was advised by my two attorneys not to make any statements. We were informed that

2    the administrative investigation was completed, specific method, and non-complex.  And, the

3    additional tax liabilities.  I was recommended for prosecution in May 2005.  The indictment and trial

4    should have happened then in 2005.  The government has no acceptable reason to drag this on for

5    another almost three additional years.  This is really a violation of due process of law and my Fifth

6    Amendment and Sixth Amendment rights.

7           **2.    Prejudice to the Defendant**

8           The government's undue delay made the government gain a tactical advantage against the

9    defendant.  The government's undue delay caused many nights and days and years of anxieties to

10   defendant and families.

11          The defendant's star witness, Dominga Harlow, recently died of lung cancer and suffered

12   anxieties before death, because she was aware that she worked for me for approximately five years,

13   1999-2003.  She can no longer testify at trial.  See Exhibit C, Death Certificate.  Her responsibilities

14   were: answering telephones and taking oral or written statements from clients; preparing tax

15   appointment reports; sometimes collecting payments; serving coffee; and other office errands.  There

16   was no agreement about salary, just gifts such as: casino dinners, and cash for the machines, and

17   other small gifts.  She was retired on disability because she had a kidney transplant, so helping me

18   during the tax season was to ease her boredom.  She was identified as Dominga Zapanga by the CID.

19   I don't know how CID got a wrong last name.  Her name was Dominga Harlow, a friend of mine for

20   over 35 years.

21          Defendant lost records and some memories due to span of time.  Records that were secured

22   were diminished because families who closed the office inefficient and irresponsible.  The business

23   office was closed last May 30, 2008.  Defendant has been incarcerated from March 28 through the

24   present date.

25          There was no federal interest gained by prosecution.  Prosecution, litigation and trial,

26   incarceration of the defendant, attorney fees, juror cost and the Honorable Judge's cost, appellate

27   cost are all wasting budgeted money of the government and wasting time.  These costs and time can

28   and should be spent on the most culpable cases.

1        **3.    Prejudice to the Public**

2        The government did not file a restraining order or file a civil injunction while charges were

3    pending years back.  Therefore, the government did not protect the public promptly and effectively.

4    **B.    18 U.S.C. 7602(1) Charges: Tax Years 2001 and 2002**

5        Reasons for dismissal:

6        The government's undue delay in charging the 2001 and 2002 tax years was to gain a tactical

7    advantage.  These allegations were known to the government six years ago.  Therefore, there was

8    no acceptable reason for the undue delay.  Finally, the government violated the defendant's due

9    process rights.

10        The defendant was prejudiced by the delay.  It caused severe anxiety to the defendant and

11    families.  Records of memories were lost.  Not all of it, but most of it.  Again, the government gained

12    a tactical advantage.  The additional amount (deficit) due to underestimated income was $3500 in

13    2001 and approximately $35,000 in 2002.  The approximate total was $38,500.  These figures were

14    given to me by the IRS lawyer during the May 2005 conference.  These amounts are much lower

15    than prosecution and trial.  These amounts could be used to settle the civil case effectively, without

16    ruining defendant's capability to produce income.

17                                                        **VII.**

18    **MOTION TO DISMISS THE INDICTMENT DUE TO SELECTIVE PROSECUTION**

19        The government violated the Fourteenth Amendment of the United States Constitution –

20    Equal Protection of Law.  Other tax preparers who had similar or the same charges (§7206(2)) were

21    only barred from preparing tax returns and the DOJ just filed a civil injunction/case.  See Exhibit D.

22    I don't understand why the DOJ has to criminally prosecute me.  Just recently in federal court in the

23    Southern District of California, dated February 2008, Roosevelt Kyle was barred from preparing tax

24    returns by the Honorable Barry Ted Moskowitz.  See Exhibit E.

25                                                        **VIII.**

26    **MOTION TO DISMISS THE INDICTMENT DUE TO THE GOVERNMENT**
      **MISLEADING THE GRAND JURY ABOUT THE FACTS OF THE CASE**

27
      The  grand  jury  indictment  was  totally  misleading  to  the  grand  jury.   The  prosecutor
28
      apparently did not tell the grand jury that the official investigation was opened in January 2003 and

1   known to the government in March 2002.  And, also, the prosecutor did not tell the grand jury that

2   the defendant continued preparing tax returns until March 28, 2008 and that the government did not

3   take any civil action to protect the public back then.  The government also did not tell the grand jury

4   that the amount of additional suspected underestimated income is very little, compared to the

5   government expenses on the prosecution; arrest; trial and incarceration; lawyers' fees; and especially

6   the Honorable Judge's time.

7                                              **IX.**

8                      **MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT**

9           The government used a magnitude of manipulation as the prosecutors used lies and

10  exaggeration to intimidate the Honorable Magistrate Judge Anthony J. Battaglia so that bail bond

11  became too excessive when these kind of charges only call for a summons and release on my own

12  recognizance.  The most damaging part of government's lies and exaggeration is that they scared my

13  family members and they tried not to be qualified on the bond application.

14                                             **X.**

15  **THE GOVERNMENT SHOULD BE REQUIRED TO DISCLOSE THE INFORMANT'S IDENTITY AND ANY *BRADY/GIGLIO* MATERIAL**

16          The defendant requests that this Court order the government to reveal the identity of the tax

17  preparer informant referenced in Special Agent Bradley's search warrant affidavit.  The informant

18  is a material, percipient witness.  His identity and all Brady/Giglio material must be disclosed.  In

19  United States v. Roviaro, 353 U.S. 53 (1957), the Supreme Court explained that the government's

20  privilege of withholding an informer's identity exists to further and protect the public interest in law

21  enforcement, but that privilege is not absolute.  Id. at 61-62.  It must give way to disclosure when

22  the "fundamental requirements of fairness" require.  Id.  Specifically, "where the disclosure...is

23  relevant and helpful to the defense of an accused or is essential to a fair determination of a cause."

24  Id. at 61-62.  Since Roviaro, the Ninth Circuit has specified certain facts to be considered, i.e. the

25  level of involvement of the informer, the helpfulness of the informer to the defense, United States

26  v. Ayala, 643 F.2d 244, 246-47 (5th Cir. 1981), and where "a close relationship between the asserted

27  defense and the informer's likely testimony favors disclosure."  Id. at 247.

28  / / /

The Ninth Circuit has affirmed <u>Roviano</u>'s principles in <u>United States v. Ramirez-Rangel</u>, 103 F.3d 1051, 1505 (9th Cir. 1997) (defendants have the right to learn the identity of the government's confidential informants if they show that the information is "relevant and helpful to the defense of an accused or is essential to a fair determination of the cause."). The facts of this case requires production of the informant. Thus, the government must disclose the informant's identity and location, as well as disclose the existence of any other percipient witness unknown or unknowable to the defense. <u>Roviano</u>, 353 U.S. at 61-2. The government must disclose any information derived from informants which exculpates or tends to exculpate the defendant. The defendant also requests disclosure of any information indicating bias on the part of any informant or cooperating witness. See <u>Giglio v. United States</u>, 405 U.S. 150 (1972). The defendant has been in jail since March 28 to present, so the Court is not endangering the informant by ordering the government to reveal his/her identity.

XI

<u>**MOTION TO PRODUCE WITNESS AND EXHIBIT LISTS**</u>

Pursuant to <u>United States v. W.R. Grace</u>, 526 F.3d 499 (9th Cir. 2008) (en banc), the defendant requests that the government produce exhibit and witness lists as soon as possible to assist her in preparing for trial.

**XII.**

<u>**CONCLUSION**</u>

For the reasons stated, I request that this Court grant my motions.


Respectfully submitted,


DATED:    August 10, 2008

**FE S. GARRETT**
Pro Se

1  **ERICA K. ZUNKEL**
   California State Bar No. 229285
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
3  San Diego, CA 92101-5008
   (619) 234-8467/Fax: (619) 687-2666
4  E-Mail: erica_zunkel@fd.org

5  Attorneys for Fe S. Garrett

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10                  **(HONORABLE M. JAMES LORENZ)**

11 UNITED STATES OF AMERICA,              )   Case No. 08CR0918-L
                                          )
12              Plaintiff,                )
                                          )
13 v.                                     )   **CERTIFICATE OF SERVICE**
                                          )
14 FE S. GARRETT,                         )
                                          )
15              Defendant.                )
   _____)

16

17        Counsel for Defendant certifies that the foregoing pleading is true and accurate to the best of her

18 information and belief, and that a copy of the foregoing document has been served this day upon:

19                    Charles Anthony O'Reilly
        Charles.A.OReilly@usdoj.gov,efile.dkt.mf@usdoj.gov,Marian.Reece@usdoj.gov;
20
                      Christopher S. Strauss
21   Christopher.s.strauss@usdoj.gov,marian.reece@usdoj.gov,efile.dkt.mf@usdoj.gov; and

22                       Fe S. Garrett
                      Reg. No. 07990-298
23                   WRDF - GEO Group
                      220 West "C" Street
24                   San Diego, CA 92101

25                              Respectfully submitted,

26

27 DATED:        August 11, 2008          /s/ Erica K. Zunkel
                                          **ERICA K. ZUNKEL**
28                                        Federal Defenders of San Diego, Inc.
                                          Attorneys for Fe S. Garrett