## Declaration of Maria Alvarez
## pursuant to 28 U.S.C. § 1746

I, Maria Alvarez, declare the following:

1. I am over 18 years of age, am a resident of California, and am competent to make this declaration.

2. I am making this declaration in connection with pretrial motions in the case *United States v. Fe S. Garrett*, 08CR0918-L.

3. I am a Special Agent with the Internal Revenue Service in the San Diego, California Field Office. I have held this position since August, 1996.

4. As part of my duties, I was assigned to the case of Fe Garrett ("Garrett") of National City, California.

5. On December 10, 2003, SA Len Bradley and I interviewed Garrett at her business at 914 East 8th Street, Suite 211 and 213, National City, California.

6. Prior to the interview SA Bradley read Garrett her Non-custody Statement of Rights. When asked if she understood her rights, Garrett stated that she did. After the reading of her right Garrett provided a statement to SA Bradley and I.

1



7. After review of the attached Memorandum of Interview (MOI), I certify that the MOI is a true and accurate account of the statements made by Garrett on December 10, 2003.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on:

*Aug. 13, 2008*
Date

*San Diego, CA*
City, State

By:

*[signature]*
Maria Alvarez

**Internal Revenue Service**
**Criminal Investigation**

**Memorandum of Interview**



---

In Re:         FE GARRETT                                    Location:   914 E. 8th Street Ste. 211 & 213
                                                                         National City, CA 91950

Investigation #:   330330031
Date:              December 10, 2003
Time:              Approximately 9:10 AM - 3:30 PM
Participant(s):    FE GARRETT, Witness
                   Len Bradley, Special Agent
                   Maria Alvarez, Special Agent

On the above date and time at approximately 9:10 AM, federal agents served a federal search warrant at 914 E. 8th Street Suite 211 & 213, National City, California 91950, the business address of FE GARRETT. Based on information received in the investigation, it was anticipated that FE GARRETT would be at a residence located at 2642 Broadrick Way, San Diego, California 92139. Special agents Len Bradley, Maria Alvarez, Ed Reyes, and Toni Haas were at the residence to obtain keys for the business location, if needed, as well as interview both FE and GREG GARRETT. The remaining agents were at the business location to execute the search warrant. After the agents completed entry, it was determined that FE GARRETT and GREG GARRETT were at the business location. Agents Bradley, Alvarez, Reyes, and Haas left the residence and went to the business. When agents Bradley and Alvarez arrived at the business, they interviewed FE GARRETT (herein referred to as GARRETT).

Before reading GARRETT her rights, agent Bradley explained to her that a search warrant was obtained to seize records from her business and that she was the subject of a criminal investigation regarding her preparation of false tax returns. GARRETT stated that she had nothing to hide and that she did nothing illegal. At approximately 10:10 AM, Agent Bradley read GARRETT her Non-Custody Statement of Rights (Document 5661) in English. When asked if she understood her rights, GARRETT stated she did. GARRETT asked the agents if she needed an attorney and agent Bradley told her that the decision was up to her if she wanted to obtain an attorney.

GARRETT provided the following information:

1.  Her name is FE SIMBAJON GARRETT and her former married name was FE HARWELL. She was born on July 25, 1947. She is married to GREGORY GARRETT and they live at 914 East 8th Street Suite 213, National City, California which is one of the business suites. Occasionally they live with

GARRETT'S daughter Dulce Wickstrom at 2642 Broadrick Way, San Diego, CA 92139. FE and GREG GARRETT usually live and sleep at the business location. The phone number to the home and business is (619) 336-4858.

2. GARRETT'S Social Security Number (SSN) is ▮▮▮▮▮▮▮▮, however when Agent Bradley asked if she ever used a different SSN, she responded yes. She stated that when she registered her name with Viejas Casino, she provided the SSN that was listed on her military identification card which listed ▮▮▮▮▮▮▮▮ as her SSN. She did not notice the SSN error on the military identification card until approximately six months after it was issued to her and subsequently after she provided it to Viejas Casino. Her military identification card has not been corrected.

3. GARRETT has four children. Their names and ages are as follows: William Harwell 30, Mark Anthony Harwell 27, Gregory Garrett Jr. 21, Dulce Wickstrom 36, and Delia Caluza 37.

4. GARRETT received her high school diploma in the Philippines. GARRETT has been in the tax preparation business since approximately 1973 or 1974. In 1974 she took a two-week tax preparation course at Spring Valley high school provided by Tax Corporation of America. In 1979 she received a Bachelor's Degree in Business Administration with an emphasis in Financial Management from National University. Every year GARRETT is required to take approximately 45 hours of continuing education to maintain her standing as a tax preparer.

5. GARRETT obtained a real estate brokers license in 1982. She has been self employed as a tax preparer since 1974 and self-employed in Real Estate since 1982. GARRETT has an Employee Identification Number (EIN) for her real estate business, but does not have an EIN or preparer tax identification number for her tax preparation business. She uses her SSN in the tax business. GARRETT has no other businesses except for the tax and real estate business and she is the sole owner of both businesses.

6. GARRETT operated GARRETT'S REALTY & MORTGAGE in suite 211 which is the same business suite as GARRETT"S TAX & ACCOUNTING. She worked with a real estate agent named Larry LNU. GARRETT also used a loan processor who was paid a fee from the borrower on each transaction. The agreement between GARRETT and Larry called for GARRETT receiving 20% and Larry receiving 80% of the commissions. The percentages were slightly adjusted depending on who solicited the real estate transaction. When commissions were received by GARRETT, she paid Larry his portion of the commission. Since 1993, GARRETT has received payments from the sale of real estate from Mortgage Partners. At the end of each year Mortgage Partners issued GARRETT a Form 1099 showing all of the income she received. As of 2001, GARRETT solely dealt with Mortgage Partners.

7. GARRETT'S real estate client files were kept with the broker and some were

kept in GARRETT'S office. GARRETT solicited mortgage refinances to her tax clients who owned homes. GARRETT submitted the same tax returns she prepared for her tax clients to mortgage companies for real estate loans.

8. GARRETT had escrow accounts set up at Southwest Bank and Comerica Bank. Sierra Pacific was one of the lenders GARRETT used to service her customers. Most recently, GARRETT used Diversified Escrow Company.

9. GARRETT'S Realty & Mortgage had a business checking account at North Island Federal Credit Union and Bank of America. FE and Greg GARRETT had personal checking accounts at Bank of America, Washington Mutual, and North Island Federal Credit Union.

10. She has been operating her tax business as GARRETT'S TAX & ACCOUNTING since approximately 2000 or 2002. She previously operated the tax business under the name FE GARRETT. The property address, 914 E. 8th Street Suite 213, National City, California 91950 was the original main business office. In February 2003, the GARRETT'S began living in suite 213 and moved the business office to suite 211. GARRETT did not want to stop leasing suite 213 because they were living there and had plans to install a shower in the suite.

11. GARRETT did not have any employees that received a salary however, her husband Greg GARRETT worked at the business, but was not paid. He received documents from clients and informed them when their returns would be complete. He also referred tax questions to GARRETT. GARRETT'S daughter, Dulce also helped out at the business. Her son Mark did some data entry for her.

12. GARRETT prepared tax returns for approximately 1000 clients which included long form 1040's and short form 1040's. She did not have an emphasis on preparing specific types of returns and subsequently prepared various types of returns. She charged between $160 and $200 for the long form which she based on the going rate of other tax preparers. She charged more than $200 if rental property was included on the return or there were additional schedules to enter. GARRETT stated she did not charge her clients for preparing a Form 1040EZ. She did not sign the 1040 EZ returns that she prepared free of charge. GARRETT only accepted check or cash for payment. She requested checks to be written to FE GARRETT. Greg GARRETT normally received the cash or check payments from clients. Upon receipt of payment, FE GARRETT either deposited the funds into a bank account or purchased business supplies.

13. GARRETT previously kept her tax client files in boxes in her former office. During the move to the current office, some files were given back to clients, some files were shredded, and some files were thrown away or lost. GARRETT did not know the current whereabouts of the client files that were thrown away or lost. GARRETT initially stated she had no business records at her residence. All of GARRETT'S tax client files from 1998 to the present are kept

on a computer located in the business. She only prepared tax returns in the office. When GARRETT prepared returns; she printed a copy of the return for the client and she kept a copy on her computer. She used the "Pro Series" tax preparation software and she entered all of the clients' data.

14. GARRETT attempted to advertise for her tax preparation business but after a failed attempt, she stopped advertising and obtained clients only by word of mouth from existing clients. GARRETT'S number of tax clients has steadily increased from 300 to 400 clients in 1998 to over 1000 clients in 2002.

15. GARRETT met with approximately 50% to 60% of her clients face to face before preparing their return. She reviewed every line of their return. GARRETT collected the required documents from the remaining clients and prepared their return in private. She would call them if documents were missing or if she had questions. GARRETT didn't meet face to face with many clients in 2002 because she was sick. GARRETT required her clients to provide her with their Forms W-2, documentation for expenses, and mortgage interest statements. During 2002, once the client dropped off their paperwork, she would only call them if she had questions for them prior to preparing their tax return. GARRETT signed every tax return and returned the documentation to the clients. The client would normally receive a phone call from Greg GARRETT notifying them to pick up their completed tax return.

16. Agent Bradley explained to GARRETT that the questionable issues on the tax returns she prepared from 1998 to the present involved the charitable contributions, employee business expenses, and child care expenses. GARRETT'S clients informed her of the expenses they incurred and provided the documentation they had to verify some of the expenses. GARRETT would include the amounts on the tax returns regardless if the client had documentation or not. According to a tax book that GARRETT referred to, she felt if the deduction was "necessary" or "realistic" then she would include them on the clients return. GARRETT only placed expenses on the tax returns if her clients instructed her to do so. If her clients didn't mention that they had expenses, then GARRETT would ask them if they incurred expenses in their employment. If they stated that they did not incur any expenses, GARRETT would determine if a particular expense would be realistic, and if so, she would include the expense on their return. GARRETT did not provide a questionnaire to her clients prior to preparing their return. GARRETT was asked to explain what "small cover pocket books" were and why were they included on over 90% of her client's charitable deductions. She stated that they were reading books, but had no response to why they were included on most of her clients' returns.

17. GARRETT identified her clients filing status by asking questions about their spouses and children. She knew the filing status of many of her clients because she had gotten to know them and their kids over the years. She recently didn't prepare many child care forms 2441 because many of her clients' children were grown up and were no longer cared for by their parents.

18. GARRETT listed the income of her clients on their tax returns based on the Forms W-2 they provided her.

19. GARRETT'S clients told her that they went to church and put cash in the collection plate, but many times didn't remember how much they contributed. GARRETT would figure out a percentage to deduct on their returns. She also said it was not required to have a receipt in order to deduct the contributions given to the church. GARRETT stated that most people do not keep receipts for household good contributions such as refrigerators, bags of clothes, and bedroom sets. GARRETT believed her clients when they told her they gave items to charity, but did not have verification. GARRETT listed the Employee Business Expenses on her clients' tax returns under the same premise as the contributions. GARRETT believed her clients when they said that they incurred a particular expense. GARRETT would deduct the expense unless she felt the expense was unrealistic.

20. GARRETT represented her clients before the IRS when they received audit letters. GARRETT explained to the IRS exactly what her clients told her regarding their missing or insufficient documentation. 50% to 60% of the time, GARRETT'S clients did not owe additional taxes. GARRETT described it as a "win" when her clients did not owe additional tax.

21. GARRETT stated that she never told a client that she could get them a larger refund by placing unsubstantiated expenses on the returns. However, GARRETT knew that her clients told other people that she was flexible and would occasionally deduct reasonable expenses on client's tax returns without receipts. GARRETT also stated that she never negotiated a deal with a client to obtain a refund by claiming false deductions on a return and splitting the refund with the client.

22. Agent Bradley informed GARRETT that an undercover agent was sent into her business posing as a new client to have a tax return prepared. Unaware that she was meeting with an undercover agent, GARRETT met with the agent and explained that there were loopholes that she used when preparing tax returns that could help obtain a larger refund. GARRETT then prepared the tax return for the agent. GARRETT also told the undercover agent that she has placed false deductions on a return and shared the refund with the client. On the recording, GARRETT talked about tax preparation as a game that she plays.

23. GARRETT initially responded to Agents Bradley and Alvarez by saying that she never spoke to clients about loopholes to obtain larger refunds or claiming false deductions. GARRETT also denied any wrongdoing and stated that she only placed items on her client's tax returns that were reasonable and realistic. GARRETT required Forms W-2 and Mortgage statements but did not require documentation for business expenses or contributions.

A break was taken at approximately 11;40 AM. At approximately 12:30 PM, Agent Bradley and Alvarez resumed the interview with FE GARRETT in suite 213.

24. GARRETT gave consent to the agents to obtain any business records kept at her daughter's residence where she and Greg previously lived.

25. GARRETT admitted that she exaggerated the Employee Business Expenses and Contributions on her clients' tax returns.

26. GARRETT also admitted she initiated placing false deductions on her clients' tax returns. Her clients often told her they didn't have verification for expenses. GARRETT would initiate the conversation with the client and place items without verification on the returns. GARRETT said that some of her clients begged her to place expenses on their return. She stated she was only helping her clients and if it meant her going to jail then she would do so because she cared for her clients. GARRETT inflated the expenses to help her clients because she said they worked hard and deserved it. GARRETT thought her actions were justified because she was not charging a large tax preparation fee to her clients.

27. GARRETT had such a large amount of returns to prepare that she filed automatic extensions on many of her clients' returns because she couldn't process them fast enough to meet the filing deadline.

28. GARRETTS' prepared the business tax returns for Zarlito's Restaurant in National City since the 1970's. The owner of the restaurant is Pete (Pepito) Aurey. GARRETT stated she correctly reported all of the income and expenses from the business. Agent Bradley and Alvarez were given two letters found by another agent during the search of the business. After reading the letter, Agent Alvarez revealed the content of the letter to GARRETT.

29. The first letter was from Pete Aurey to FE GARRETT stating that he no longer wanted GARRETT to prepare the business tax returns as of 2003 because she made numerous errors and one of the returns was recently audited by the IRS. He stated it wasn't worth the trouble to have her continue preparing the returns. The second letter was a reply from GARRETT to Mr. Aurey stating that for many years he has not reported all of his income and he has lied to the Board of Equalization. She questioned Aurey's sudden change of heart when, for many years she has helped him.

30. GARRETT'S response to the letters was that she knew that the correct amount of income was not reported on the Zarlito's tax returns. She closed her eyes to the situation and reported the figures that Mr. Aurey provided to her.

31. GARRETT identified her signature on her 1998, 1999, 2000, and 2002 original Form 1040 tax returns. GARRETT also identified her signature on a copy of her 2002 Form 1040 tax return. Agent Bradley asked GARRETT if she and Greg GARRETT reported all of their income on their tax returns from 1998 through 2002. GARRETT initially stated that she did report all of her income and she deposited every check received from the tax and real estate business. She then

stated that she neglected to report between $1,000 and $2,000 per year in cash on her tax returns, but that the estimate might be incorrect. She continued to explain that the figure might be higher.

32. GARRETT'S income was derived from real estate commission reports, a Form 1099 from Mortgage Partners, and income from tax preparation. GARRETT'S income from the tax preparation was estimated. She estimated the total number of long form tax returns prepared and estimated the average price charged. Because GARRETT estimated her income from tax preparation, ultimately her taxable income was estimated on her personal returns. GARRETT did not have any formal bookkeeping system for her business expenses and income. GARRETT stated she kept poor business records.

33. GARRETT stated that she was addicted to gambling on slot machine games. She went to Viejas Casino several times per week to play the slot machines. GARRETT went to the casino when she had free time. After the bills were paid, she would bring any leftover money she had to the casino. GARRETT used money from the Real Estate business and the tax preparation business to gamble. The largest amount of money she would bring to the casino is $2,000. If GARRETT won money, she would return to the casino with the winnings and if she lost, she would not gamble until she obtained more money. She occasionally borrowed money from her son-in-law to gamble.

34. Greg GARRETT also went to the casino, but did not gamble as much as GARRETT. Greg GARRETT received approximately $12,000 per year in retirement income from the United States Navy.

35. GARRETT asked the agents if it was necessary for her to obtain an attorney. Agent Alvarez told GARRETT that as she was told at the beginning of the interview it was her decision whether or not to get an attorney. GARRETT again stated felt she had done nothing wrong.

The agents ended the interview at approximately xxxxxxxxxx

*Maria Alvarez*
Maria Alvarez
Special Agent

*Len Bradley*
Len Bradley
Special Agent

I prepared this memorandum on January 30, 2004, after refreshing my memory from notes made during and immediately after the interview with FE GARRETT.

*Len Bradley*
Len Bradley
Special Agent