## Declaration of Special Agent Toni Haas
## pursuant to 28 U.S.C. § 1746

I, Toni Haas, declare the following:

1. I am over 18 years of age, am a resident of California, and am competent to make this declaration.

2. I am making this declaration in connection with pretrial motions in the case *United States v. Fe S. Garrett*, 08CR0918-L.

3. I am a Special Agent with the Internal Revenue Service in the San Diego, California Field Office. I have held this position since September, 1999.

4. As part of my duties, I was assigned to the case of Fe Garrett ("Garrett") of National City, California.

5. On December 10, 2003, SA Ed Reyes and I interviewed Gregory Garrett, Sr. at 914 East 8th Street, Suite 211 and 213, National City, California.

6. Prior to the interview SA Reyes read Gregory Garrett, Sr. his Non-custody Statement of Rights. Gregory Garrett, Sr. stated that he understood his rights and that he agreed to speak with us.

7. After review of the attached Memorandum of Interview (MOI), I

1


EXHIBIT E
2472042.2
3505494.1

certify that the MOI is a true and accurate account of the statements made by Gregory Garrett, Sr. on December 10, 2003.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on:

August 13, 2008
Date

San Diego, CA
City, State

By:

*Toni Haas* (signature)
Toni Haas

## Internal Revenue Service
## Criminal Investigation

## Memorandum of Interview

| | | | |
|---|---|---|---|
| In Re: | GARRETT, FE | Location: | Fe Garrett Accounting and Tax Service<br>914 East 8th Street<br>Suite 213<br>National City, CA 91950 |

Investigation #: 330330031
Date: December 10, 2003
Time: Approx. 9:10 am
Participant(s): Gregory GARRETT, Interviewee
Toni Haas, Special Agent
Ed Reyes, Special Agent

On December 10, 2003, Special Agents with the Internal Revenue Service, Criminal Investigation executed a search warrant on FE GARRETT ACCOUNTING AND TAX SERVICE located at 914 East 8th Street, Suites 211 & 213, National City, CA 91950. Pursuant to the search warrant, Special Agents Ed Reyes and Toni Haas interviewed Greg GARRETT, an employee and husband of FE GARRETT. Special Agents Reyes and Haas presented our official credentials to GARRETT for his inspection and explained to him that we had several questions regarding his involvement with the business. Prior to any questions being asked, Special Agent Reyes read GARRETT his non-custodial rights verbatim from Document 5661 (revised 4/2000). GARRETT stated that he understood his rights and agreed to speak with us. Pursuant to our questions, GARRETT stated the following:

1. GARRETT'S full name is Gregory Marvin GARRETT Sr. He was born in Tucson, Arizona and his date of birth is October 3, 1951. His social security number is ███████████. GARRETT considers his health as "ok". GARRETT does not have a criminal record.

2. GARRETT is currently married to FE GARRETT. They were married on July 8, 1978. They have one child together. His name is Gregory M. Garrett, Jr., dob: 12/9/82. FE has 4 children from a previous marriage. They are:
   William Michael Harwell, dob: █/█/7█.
   Mark Anthony Harwell, dob: ███████.
   Delia Caluza, unknown dob, approximately 36-37 years old.
   Dulce Wickstrom, unknown dob, approximately 34-35 years old.

3. The GARRETTS are currently living at the business location of 914 East 8th Street, Suite 213. They converted a room in the back of the business as their residence. The home and business number is 619-336-4858. Prior to living at this location, they resided with FE'S daughter, Dulce Wickstrom at 2642 Broderick Way, San Diego, CA. GARRETT maintains that suite 213 is no longer used for business operations. It is only used as living quarters.

4. GARRETT received his high school diploma from San Rafael High School. He attended Marin College in Kentfield, CA for two years. He did not obtain any degrees. GARRETT has never taken any courses in bookkeeping, accounting, or tax. However, he has ordered some tax courses for this year. GARRETT does not hold any professional licenses.

5. GARRETT joined the United States Navy on November 18, 1976 and retired on November 30, 1996.

6. He is currently employed by his wife, FE at her Accounting and Tax Service. His position is Office Assistant. His job duties are answering phones, taking messages, and filing. He has held this position for three years at the current location. Prior to moving to this location, FE'S ACCOUNTING AND TAX SERVICE was located at 1210 East 2nd Street, National City, CA. This address was both a residence and business address for him and FE from 1995 until approximately three years ago.

7. GARRETT does not have any other work experience in field of accounting or tax. His wife, FE is the one with all of the accounting and tax experience. In the Navy, GARRETT was a Mess Management Specialist.

8. The tax and mortgage businesses have been in FE'S name since 1995. The mortgage business used to be called "MORTGAGE PARTNERS". The current name of the business is GARRETT'S REALTY AND MORTGAGE. The accounting and tax business used to be called "FE GARRETT". The current business name is GARRETT'S TAX SERVICE. FE does not have any partners in either business.

9. FE does not have any employees for the tax business, other than GARRETT. She does not have any consultants, part-time employees, or temps. FE'S son-in-law used to work for her at the tax business at one time. He left her business and opened his own tax business in Escondido, CA approximately two years ago. His name is Edward Caluza. Caluza worked for FE from approximately 2001 until 2002. Caluza prepared and signed clients' tax returns. He also had his own clients. Caluza was trained by FE on how to prepare tax returns. GARRETT believes that Caluza's business is called ED CALUZA'S TAX SERVICE. He believes that Caluza has approximately 400 clients.

10. FE'S daughter, Dulce Wickstrom works at the mortgage business as a loan processor. Wickstrom processes the real estate loans, and prepares the

paperwork to submit to lenders.

11. FE specializes in the area of personal income tax. She has a vast knowledge of tax and she was an accountant for many years. GARRETT estimates that FE has thirty years of experience in taxes. She prepares 1040's and California State tax returns (form 540). She does not prepare corporate or business tax returns.

12. GARRETT estimates the tax client base to be about 1200. The client list is maintained in the computer. Most of the clients are Filipinos. Every year is usually the same clients. FE recently used the newspaper next door for real estate advertising. Her tax business is mostly by word of mouth. FE signs all of the client's tax returns as the preparer.

13. The usual process for a tax client is as follows: The client would make an appointment, the client would meet with FE for an interview, FE would ask normal tax questions, such as; # of dependants, marital status, and job information. FE would request proof of the information provided by the client. No one else interviewed the clients. Approximately one hour was spent with each client during the interview. FE would place all of the client information into a folder and prepare the tax return later.

14. Sometimes clients would walk-in and request their tax return to be prepared. In that case, they would drop off their information and the tax return would be prepared at a later date. All new clients would complete a questionnaire.

15. After the tax return was complete. The client would be called to come in and pick up the tax return. The client would either sign the tax return at the office or at home. The clients were responsible to mail their own tax returns. FE would review the tax return with the client. Occasionally, FE would review the tax return with the client line by line. If FE was not in the office, then GARRETT would review the tax return with the client. GARRETT would normally show the client was he/she owed or if they were getting a refund. GARRETT does not go over the tax return with the client line by line. Sometimes FE would write down for GARRETT what information to go over with the client if she was not going to be there. All tax questions the client had would be referred to FE. FE spent approximately one hour preparing each client's tax return. She would enter all of the tax return data into the computer.

16. Recently, FE was trying to train her son Tony on the preparation of income tax returns. Sometimes Tony would do the inputting of the taxpayer data for the tax return. FE would review what Tony input, if it was correct, then she would sign the tax return. Tony did not interview the clients.

17. FE required all of her clients to provide documentation for their income, deductions, and expenses. Such documentation included W-2's, mortgage statements, IRA's, charitable deductions, and employee business expenses.

FE would return the originals to the clients after the tax return was complete.

18. From 1999 to the present all of the tax returns and client information is stored on the office computer. The tax returns and client information for the tax years 1997 and 1998 are in boxes in storage at her daughter's house. GARRETT estimates that there are 4-5 boxes in the garage. The address is 2642 Broderick Way, San Diego, CA.

19. All of the tax returns are computer generated using the Pro Series software. FE has prepared tax returns manually in the past, but stopped after the computer was purchased. FE does not file any tax returns electronically. FE does not participate in the Rapid Anticipation Loan program (RAL).

20. The amount FE charges to prepare a tax return depends on the amount of work that needs to be done. The usual fee for a form 1040 EZ of a form 1040A is $50.00 - $60.00. Tax returns that have a small business or rental property are charged $200.00 - $300.00. FE never bases the fee on the amount of the refund generated. GARRETT stated, "That would be illegal". FE only bases her fee on the amount of work that needed to be done. GARRETT added that FE now bases her tax return preparation fee on the amount of income the client earns. GARRETT gave an example of someone who earned $100,000.00 per year would be charged $225.00 for their tax return.

21. FE'S clients usually paid with a check. GARRETT would give the checks to FE. FE did not maintain a bookkeeping system for the business. GARRETT was the one who made most of the deposits into the bank. Sometimes clients would pay in cash. When that happened, it would be recorded in a cash receipts book. GARRETT estimated that 10% of the clients paid in cash and 90% of the clients paid by check. GARRETT would deposit all of the cash.

22. All of the expenses for the business are kept in an envelope by tax year. FE prepares the tax returns for the business. GARRETT does not know how FE comes up with the total income for the business.

23. GARRETT does not receive any pay for working at the tax business as an Office Manager. When asked if FE gets paid, he stated, "Ask her, I can't answer that."

24. GARRETT and FE filed their income tax returns or the tax years 2001 and 2002 as "Married filing Separate". The prior tax years were filed as "Married filing Joint". FE prepared her own 2001 and 2002 income tax returns as well as GARRETT'S 2001 and 2002 income tax returns. GARRETT'S income tax returns do not report any taxable income. His tax returns only reflect his government pension.

25. In the past only 6-7 clients have been audited by the IRS. FE is not an

Enrolled Agent. She would represent the taxpayer at the audit by having the taxpayer sign a Power of Attorney.

26. GARRETT stated that he was surprised that Federal Agents were at the business executing a search warrant. GARRETT was asked about his knowledge of any areas on the tax returns that can be exaggerated. He replied, "Ask her about that" (referring to FE). He was also asked about any discussions about "loopholes" on the tax returns. He again replied, "Ask her about that" (referring to FE).

27. GARRETT was asked about his knowledge of common similarities on the tax returns that FE prepares. He replied, "I don't know, that's something you will have to talk to her about".

At this point, Special Agents informed GARRETT that an extensive investigation had been made on GARRETT'S TAX SERVICE and the statements GARRETT was making did not corroborate the facts known to the Special Agents involved with the investigation. It was stressed to GARRETT that he be forthwith with his answers and in his best interest to tell the truth. At this point, GARRETT made the following statements in response to our questions.

28. A client that comes in to the office to have his/her tax return prepared has to have a form W-2, mortgage interest statement, and documentation for college for their kids if it applies.

29. A lot of FE'S clients are professional people and she prepares a lot of Schedule A's. FE prepares a lot of tax returns for nurses. She writes off their uniforms, mileage, and seminars that they may attend. Those figures are not make-believe, the expenses are accurate. GARRETT later stated that the Union Dues are not fudged, but some of the uniform expense amounts are fudged on the tax returns.

30. FE fudges on the contributions on the tax returns she prepares. Sometimes the clients have receipts for contributions. FE uses contributions to reduce the client's tax liability whether they have receipts or not. GARRETT stated that contributions are one of the easiest things to do on the tax return. GARRETT follows FE'S lead.

31. FE does not fudge on anything else the GARRETT knows of.

32. GARRETT could not recall if a client ever questioned the completed tax return's figures with him. When pressed, GARRETT admitted that maybe a few clients may have questioned the tax return. He would tell them that they needed to talk to FE.

33. When asked about Child Care expenses on the tax returns, GARRETT admitted that this is an area that can be fudged. GARRETT further stated

that it is his understanding that if a child care provider refuses to provide his/her social security number, then the taxpayer can state on the tax return that the provider refused to provide their identifying information. This allows the taxpayer to still be able to claim a deduction for child care. GARRETT believes that FE would often use that statement on the tax returns she prepares if a client did not have any receipts for child care.

34. Sometimes FE would make up the child care provider and amount claimed on the client's tax return.

35. GARRETT is not aware of FE providing false documents to IRS auditors for her clients' audits.

36. Only within the last 2 years did GARRETT become aware that FE was fudging the tax returns she prepared. When he confronted her, she told him to keep his mouth shut and to mind his own business. She told him she knew what she was doing. GARRETT knew that something wasn't right with the preparation of the tax returns, but he didn't think it would be at a criminal level.

37. Some of FE'S clients did not like the tax returns amounts. If they confronted her about it, she would change the amounts.

38. GARRETT estimated that over $80,000.00 a year was generated from the tax business. He does not know if it was accurately reported on the tax returns filed. GARRETT does not know anything about the mortgage side of the business.

39. GARRETT and FE maintain a business account for GARRETT'S TAX SERVICE and their personal joint checking and savings account at North Island Financial Credit Union. FE has several bank accounts for the mortgage business at several banks. GARRETT'S REALTY AND MORTGAGE have accounts at Southwest Bank, North Island Financial Credit Union, and Comerica Bank.

40. Occasionally, checks from business clients are deposited into GARRETT'S and FE'S personal bank account. GARRETT does not deposit that much currency. No client refunds are ever deposited into GARRETT'S or FE'S bank accounts.

41. FE has recently received a lot of correspondence from the IRS on behalf of her clients. Most of the correspondence is regarding the audit of her clients. GARRETT estimates that close to 100 audits of her clients are pending. Most of them are for the tax year 2001. The audit issues are mostly Schedule A items and business expenses.

42. The audit letters are coming from the Service Center in Texas as correspondence audits. FE is having her clients request that the audit be

transferred to the local San Diego IRS office for a face to face interview. FE does not seem concerned about 100 audits that are pending.

43. FE does not have any outstanding loans from the company to GARRETT'S knowledge.

The interview was suspended at 10:25 am until approximately 10:52 am.

44. The fudging that FE does goes both ways. GARRETT explained that sometimes FE tells her clients that she is adding to charitable contributions to lower their tax liability and sometimes the clients ask FE to add more contributions.

45. GARRETT has never prepared any tax returns, conducted any client interviews, or input any client data.

46. FE is still trying to catch up on the tax returns for the tax year 2002. She uses extensions quite a bit.

47. A lot of FE'S tax clients are also mortgage clients, GARRETT thinks there are about 100 mortgage clients. Most of the activity from the mortgage business is refinances. GARRETT estimates that 80% of the business is refinances.

48. To GARRETT'S knowledge FE would never provide false documents on behalf of her clients obtain mortgage loans. FE would not have two sets of tax returns, one for the IRS and one for a lender. GARRETT made the statement that FE'S mortgage business was on the up and up.

49. When asked why FE would fudge on the tax return business and not on the mortgage business, GARRETT responded, "I don't know".

50. GARRETT admitted that with FE'S authority, he would sign FE'S name on tax returns.

51. FE frequently gambles at the Viejas Casino. She recently won $20,000 and is trying to rectify a discrepancy with the social security number on her military identification card.

52. Between the two offices there are 5 computers. Four are working and one is not working. They acquired the computers in 1997 and 1998.

The interview was suspended from approximately 11:12 am until 11:35 am

53. GARRETT identified his 1998 income tax return filed joint with FE. He also identified his signature on the return. GARRETT prepared the 1998 tax return.

54. GARRETT identified his 1999 income tax return filed joint with FE. He also identified his signature on the return. FE prepared the 1999 tax return. When looking at the gross receipts figure on the schedule C, GARRETT stated that the income seemed low.

55. GARRETT identified his 2000 income tax return filed joint with FE. He also identified his signature on the return. FE prepared the 2000 tax return. GARRETT admitted that the contribution amount stated on the Schedule A was probably not that much. GARRETT also admitted that the gross receipts listed on the Schedule C seemed low.

56. GARRETT identified the copy of the 2002 income tax return. He also identified his signature on the return. FE prepared GARRETT'S 2002 income tax return.

At this time we informed GARRETT that the interview was concluded. We thanked him for his cooperation and the interview was terminated at approximately 11:50 am.

*Toni Haas*
Toni Haas
Special Agent

*Edward A. Reyes*
Edward Reyes
Special Agent