### UNITED STATES V. FE S. GARRETT
**U.S.D.C. Case No. 08cr0918-L**

### INDEX OF EXHIBITS

Exhibit 1 - Letter dated August 7, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Exhibit 2 - IRS-CI Preparer Information Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Exhibit 3 - Non-Custody Statement of Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Exhibit 4 - Consents to Search and Seize Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Exhibit 5 - Order Denying Motion to Dismiss; 07cr0491-BTM . . . . . . . . . . . . . . . . . . . . . . . 17
Exhibit 6 - Amended Order Denying Motion to Dismiss; 07cr1372-JAH . . . . . . . . . . . . . . . . 29
Exhibit 7 - Excerpt from Search Warrant Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40



**U.S. Department of Justice**

*Karen P. Hewitt*
*United States Attorney*
*Southern District of California*

| | |
|---|---|
| *Christopher S. Strauss* | *(202) 514-5762* |
| *Special Assistant United States Attorney* | *Fax (202) 514-9623* |

*San Diego County Office*
*Federal Office Building*
*880 Front Street, Room 6293*
*San Diego, California 92101-8893*

*Imperial County Office*
*516 Industry Way*
*Suite C*
*Imperial, California 92251-7501*

August 7, 2008

BY FEDERAL EXPRESS

Ms. Fe Garrett
Register No. - 07990-298
The Geo Group
Western Region Detention Facility
220 West C Street
San Diego, CA 92101
(619) 232-9221

Re:    <u>Notice of Intent to Introduce Evidence Pursuant to Federal Rule of Evidence 404(b)</u>
       <u>United States v. Fe S. Garrett</u>, Criminal Case No. 08-CR-0918-L

Dear Ms. Garrett:

   The United States provides to you this notice of its intent to introduce evidence of other crimes, wrongs, or acts pursuant to Federal Rule of Evidence 404(b). Rule 404(b) requires that the United States provide "reasonable notice . . . of the general nature" of such evidence the government intends to introduce at trial. The notice requirement (like Rule 404(b) itself) does not extend "to evidence of acts which are 'intrinsic' to the charged offense." <u>Committee Note</u>, Fed. R. Evid. 404(b); <u>see also</u> <u>United States v. Beckman</u>, 298 F.3d 788, 793-94 (9th Cir. 2002) ("Evidence of 'other acts' is not subject to Rule 404(b) analysis if it is 'inextricably intertwined' with the charged offense); <u>United States v. Kallin</u>, 50 F.3d 689, 696 (9th Cir. 1995) (holding the admission of corporate tax returns for which prosecution would be barred by the statute of limitations was not subject to Rule 404(b) because it was part of a "larger scheme" to evade personal taxes for which the defendant was indicted).

   The United States contends that evidence regarding the acts listed below should be admitted into evidence as inextricably intertwined with the offenses charged and is not subject to Rule 404(b). However, in an abundance of caution, the United States hereby gives you notice of its intention to introduce evidence of the following acts:

Re:    Notice of Intent to Introduce Rule 404(b) Evidence
       <u>United States v. Fe S. Garrett</u>,
       Criminal Case No. 08CR0918-L

<div style="border:2px solid black; background:yellow;">

**GOVERNMENT**
**EXHIBIT**

**1**

</div>

(1)    The preparation of federal individual income tax returns for the following taxpayers for the following years which contained false deductions:

    a.    2000 Form 1040 for Homer and Myrna Dizon;
    b.    2000 Form 1040 for Pepito Aure;
    c.    2000 Form 1040 for Erwin Apsay and Michelle Davis;
    d.    2000 Form 1040 for Ven and Zenaida Diomino;
    e.    2000 Form 1040 for Jose Dante and Rosalina Colocado;
    f.    2000 Form 1040 for Vincent and Jolene Hubbard;
    g.    2000 Form 1040 for Lorenda Fabro;

(2)    The preparation of federal tax returns for the following taxpayers for the following years:

    a.    2003 Form 1040 for Jose Dante and Rosalina Colocado;
    b.    2003 Form 1040 for Thomas and Maria Miller;

(3)    The preparation of a false 2002 Form 1040 federal income tax return for "Ceclia Marie Vicente", who was in fact undercover Internal Revenue Service Special Agent Ceclia Braga;

(4)    All of the statements made to the undercover Internal Revenue Special Agent on April 2, 2003, regarding any and all past conduct, including but not limited to admissions of fabricating deductions on clients' prior federal income tax returns and fabricating a business on a prior client's federal income tax return;

(5)    All of Gregory Garrett, Sr.'s statements which were made to the undercover Internal Revenue Service Special Agent on August 6, 2003, including, but not limited to, admissions that other clients' federal tax returns contain fabricated and false Schedule A and Child Care Expense deductions;

(6)    Admissions made by you to Internal Revenue Service Special Agents on December 10, 2003, and July 3, 2007 regarding placing inflated deductions on clients' federal income tax returns.


    The United States has provided the above-listed federal individual income tax returns to the you in discovery. With respect to the evidence concerning the Internal Revenue Service undercover operation, the United States has provided recordings and transcripts of the April 2, 2003, and August 6, 2003 meetings with Fe Garrett and Gregory Garrett, Sr., as well as other recordings of the contacts the undercover agent had with individuals speaking on your behalf. The United States has also provided to you a copy of a Memorandum of Interviews that document your admissions to the Internal Revenue Service Special Agents on December 10, 2003 and July 3, 2007.


Re:    Notice of Intent to Introduce Rule 404(b) Evidence
        United States v. Fe S. Garrett,
        Criminal Case No. 08CR0918-L

The United States intends to introduce evidence of the acts listed above as inextricably intertwined with the charged offenses and relevant as direct evidence of the offenses charged or, alternatively, as evidence of other acts which is admissible under Rule 404(b). The United States reserves the right to tender timely notice of evidence of additional acts that may also be direct evidence of an element of the offenses charged or, alternatively, as evidence of other acts admissible under Fed. R. Evid. 404(b).

Sincerely,

KAREN P. HEWITT
United States Attorney

CHRISTOPHER S. STRAUSS
Special Assistant U.S. Attorney

cc:    Erica Zunkel, Esq.
       Stand-by Counsel
       Federal Defenders of San Diego
       By facsimile: (619) 687-2666

Re:    Notice of Intent to Introduce Rule 404(b) Evidence
       United States v. Fe S. Garrett,
       Criminal Case No. 08CR0918-L

3

# Fresno Service Center Criminal Investigation Branch
## Preparer Information Report

Optional Information

| | |
|---|---|
| **Preparer Name:** FAYES TAX SERVICE | **Informant Name:** _____ |
| **Address:** 1210 E. 2nd St | **Address:** _____ |
| National City, CA 91950 | _____ |
| **SSN/EIN:** 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 | **SSN/EIN:** _____ |
| **Phone:** 619-474-4221 | **Phone:** _____ |

## Preparer Questions:

1. How did you learn about the preparer?

   2000 Income Tax Return of my new client , *Copy Attached*

2. What false information does the preparer use?

   GIFTS TO CHARITY: Cash or Check $8,000.00 & Non-Cash=$2,800.00

3. How many returns are involved?

   Hundreds to Thousands every year

4. Does he/she sign the returns?

   Yes

5. What type of clients does the preparer have — farmworkers, business people, etc.?

   INDIVIDUAL

6. Is the Earned Income Credit involved?

   Maybe- Filing returns as Head of Household from married if taxpayer have dependent.

7. Does the preparer provide false W-2's?

   I'm not sure

8. Does the preparer file electronic or paper returns?  NO

9. Does the preparer issue refund anticipation loans?  NO



GOVERNMENT
EXHIBIT
2

10. What is the preparer's Electronic Filing Identification Number?   Not applicable

*7*

**11. Does the preparer have his clients sign blank returns?**

I'm not sure

**12. Does the preparer promise an amount of refund before the return is prepared?**

Maybe because she charge more than hundred per client.

**13. How does the preparer charge his clients? A set fee or percent of refund?**

Cash payment. Hundreds by cash or set fee or percent of refund.

**14. Do you know what address or addresses the preparer has the refund checks sent to?**

Not applicable

**15. Are returns computer generated?**    YES

**16. Does the preparer keep return data on computer disks? Where are they kept?**

Same as above

**17. Where are hard copies kept?**    SAM AS ABOVE

**18. Has the preparer been audited/investigated by the IRS?**

NOT YET I THINK BECAUSE I HEARD THIS PREPARER MANY YEARS AGO.

**19. Do others assist in return preparation?**    not applicable

**20. How are clients recruited?**

WORD OF MOUTH OR RECOMMENDATION FROM HER CLIENTS DUE
TO BIG REFUND AND CLAIMING EXCESSIVE DEDUCTIONS IN
CONTRIBUTIONS & MISC. DEDUCATIONS SUCH AS UNIFORMS ETC.

*8*

Form **1040**    Department of the Treasury — Internal Revenue Service
**U.S. Individual Income Tax Return    2000**    (99)    IRS use only — Do not write or staple in this space.

For the year Jan 1-Dec 31, 2000, or other tax year beginning _____, 2000, ending _____, 20___    OMB No. 1545-0074

**Label** (See instructions.)
Use the IRS label. Otherwise, please print or type.

Your First Name    MI    Last Name

If a Joint Return, Spouse's First Name    MI    Last Name

Home Address (number and street). If You Have a P.O. Box, See Instructions.    Apartment No.

City, Town or Post Office. If You Have a Foreign Address. See Instructions.    State    ZIP Code

Your Social Security Number

Spouse's Social Security Number

▲ **Important!** ▲
You must enter your social security number(s) above.

**Presidential Election Campaign** (See instructions.)
▶ Note: Checking 'Yes' will not change your tax or reduce your refund.
Do you, or your spouse if filing a joint return, want $3 to go to this fund? ........ ▶

You    [X] Yes    [ ] No
Spouse    [X] Yes    [ ] No

**Filing Status**

Check only one box.

1    [ ]    Single
2    [X]    Married filing joint return (even if only one had income)
3    [ ]    Married filing separate return. Enter spouse's SSN above & full name here .... ▶
4    [ ]    Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here ... ▶
5    [ ]    Qualifying widow(er) with dependent child (year spouse died ▶ _____). (See instructions.)

**Exemptions**

6a    [X]    Yourself. If your parent (or someone else) can claim you as a dependent on his or her tax return, do not check box 6a .............................................................

b    [X]    Spouse ..............................................................................................

c    Dependents:

| (1) First name    Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see instructions) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

If more than six dependents, see instructions.

No. of boxes checked on 6a and 6b    **2**

No. of your children on 6c who:
• lived with you
• did not live with you due to divorce or separation (see instructions)
Dependents on 6c not entered above
Add numbers entered on lines above ▶    **2**

d    Total number of exemptions claimed .................................................................

**Income**

Attach Forms W-2 and W-2G here. Also attach Form(s) 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| | | | |
|---|---|---|---|
| 7 | Wages. salaries, tips, etc. Attach Form(s) W-2 .................................... | 7 | 85,468. |
| 8a | Taxable interest. Attach Schedule B if required ................................... | 8a | |
| b | Tax-exempt interest. Do not include on line 8a ......... 8b | | |
| 9 | Ordinary dividends. Attach Schedule B if required ................................ | 9 | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see instructions) ...... | 10 | 991. |
| 11 | Alimony received ............................................................... | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ ............................. | 12 | |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ..... ▶ | 13 | |
| 14 | Other gains or (losses). Attach Form 4797 ...................................... | 14 | |
| 15a | Total IRA distributions ...... 15a | b Taxable amount (see instrs) .. | 15b | |
| 16a | Total pensions & annuities . 16a | b Taxable amount (see instrs) .. | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E .. | 17 | |
| 18 | Farm income or (loss). Attach Schedule F ...................................... | 18 | |
| 19 | Unemployment compensation .................................................. | 19 | |
| 20a | Social security benefits ...... 20a | b Taxable amount (see instrs) .. | 20b | |
| 21 | Other income. List type & amount (see instrs) | 21 | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your total income ▶ | 22 | 86,459. |

**Adjusted Gross Income**

| | | | |
|---|---|---|---|
| 23 | IRA deduction (see instructions) ...................... | 23 | |
| 24 | Student loan interest deduction (see instructions) ........... | 24 | |
| 25 | Medical savings account deduction. Attach Form 8853 ....... | 25 | |
| 26 | Moving expenses. Attach Form 3903 ................... | 26 | |
| 27 | One-half of self-employment tax. Attach Schedule SE ....... | 27 | |
| 28 | Self-employed health insurance deduction (see instructions) .. | 28 | |
| 29 | Self-employed SEP, SIMPLE, and qualified plans ........... | 29 | |
| 30 | Penalty on early withdrawal of savings .................. | 30 | |
| 31a | Alimony paid  b Recipient's SSN .... ▶ | 31a | |
| 32 | Add lines 23 through 31a | 32 | |
| 33 | Subtract line 32 from line 22. This is your adjusted gross income ................. ▶ | 33 | 86,459. |

BAA For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see instructions.    Form 1040 (2000)
FDIA0112  11/07/00

**Form 1040 (2000)**

Page 2

| | | | |
|---|---|---|---|
| **Tax and Credits** | 34 Amount from line 33 (adjusted gross income) .................... | 34 | 86,459. |

35a Check if: ☐ You were 65/older, ☐ Blind; ☐ Spouse was 65/older, ☐ Blind.
Add the number of boxes checked above and enter the total here ............ ► 35a

b If you are married filing separately and your spouse itemizes deductions, or you were a dual-status alien, see instructions and check here .............. ► 35b ☐

**Standard Deduction for Most People**

Single: $4,400

Head of household: $6,450

Married filing jointly or Qualifying widow(er): $7,350

Married filing separately: $3,675

| | | |
|---|---|---|
| 36 Enter your itemized deductions from Schedule A, line 28, or standard deduction shown on the left. See instructions to find your standard deduction if you checked any box on line 35a or 35b or if someone can claim you as a dependent ............ | 36 | 37,777. |
| 37 Subtract line 36 from line 34 ........................................ | 37 | 48,682. |
| 38 If line 34 is $96,700 or less, multiply $2,800 by the total number of exemptions claimed on line 6d. If line 34 is over $96,700, see the worksheet in the instructions for the amount to enter .......... | 38 | 5,600. |
| 39 Taxable income. Subtract line 38 from line 37. If line 38 is more than line 37, enter -0- ... | 39 | 43,082. |
| 40 Tax (see instrs). Check if any tax is from a ☐ Form(s) 8814 b ☐ Form 4972 ........ | 40 | 6,461. |
| 41 Alternative minimum tax. Attach Form 6251 ............................ | 41 | |
| 42 Add lines 40 and 41 ........................................... ► | 42 | 6,461. |

| | | | |
|---|---|---|---|
| 43 Foreign tax credit. Attach Form 1116 if required ............ | 43 | | |
| 44 Credit for child and dependent care expenses. Attach Form 2441 ........ | 44 | | |
| 45 Credit for the elderly or the disabled. Attach Schedule R ..... | 45 | | |
| 46 Education credits. Attach Form 8863 ................ | 46 | | |
| 47 Child tax credit (see instructions) ................ | 47 | | |
| 48 Adoption credit. Attach Form 8839 ................ | 48 | | |
| 49 Other. Check if from ... a ☐ Form 3800 b ☐ Form 8396 c ☐ Form 8801 d ☐ Form (specify) | 49 | | |

| | | |
|---|---|---|
| 50 Add lines 43 through 49. These are your total credits ...................... | 50 | |
| 51 Subtract line 50 from line 42. If line 50 is more than line 42, enter -0- ......... ► | 51 | 6,461. |

**Other Taxes**

| | | |
|---|---|---|
| 52 Self-employment tax. Attach Schedule SE ............................ | 52 | |
| 53 Social security and Medicare tax on tip income not reported to employer. Attach Form 4137 ..... | 53 | |
| 54 Tax on IRAs, other retirement plans, and MSAs. Attach Form 5329 if required ....... | 54 | |
| 55 Advance earned income credit payments from Form(s) W-2 ............ | 55 | |
| 56 Household employment taxes. Attach Schedule H ...................... | 56 | |
| 57 Add lines 51-56. This is your total tax ...................... ► | 57 | 6,461. |

**Payments**

If you have a qualifying child, attach Schedule EIC.

| | | | |
|---|---|---|---|
| 58 Federal income tax withheld from Forms W-2 and 1099 ...... | 58 | 8,741. | |
| 59 2000 estimated tax payments and amount applied from 1999 return ... | 59 | | |
| 60a Earned income credit (EIC) ...................... | 60a | | |
| b Nontaxable earned income: amount .. ► and type .. ► | | | |
| 61 Excess social security and RRTA tax withheld (see instrs) .... | 61 | | |
| 62 Additional child tax credit. Attach Form 8812 ............... | 62 | | |
| 63 Amount paid with request for extension to file (see instructions) .... | 63 | | |
| 64 Other payments. Check if from ..... a ☐ Form 2439 b ☐ Form 4136 ................ | 64 | | |

| | | |
|---|---|---|
| 65 Add lines 58, 59, 60a, and 61 through 64. These are your total payments ..................... ► | 65 | 8,741. |

**Refund**

Have it directly deposited! See instructions and fill in 67b, 67c, and 67d.

| | | |
|---|---|---|
| 66 If line 65 is more than line 57, subtract line 57 from line 65. This is the amount you overpaid ......... | 66 | 2,280. |
| 67a Amount of line 66 you want refunded to you. ..................... ► | 67a | 2,280. |

► b Routing number ........ _____ ► c Type: ☐ Checking ☐ Savings
► d Account number _____

| | | |
|---|---|---|
| 68 Amount of line 66 you want applied to your 2001 estimated tax ........ ► 68 | | |

**Amount You Owe**

| | | |
|---|---|---|
| 69 If line 57 is more than line 65, subtract line 65 from line 57. This is the amount you owe. For details on how to pay, see instructions ..................... | 69 | |
| 70 Estimated tax penalty. Also include on line 69 ............. 70 | | |

**Sign Here**

Joint return? See instructions.

Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Your Signature ►          Date          Your Occupation          Daytime Phone Number
MAIL CARRIER

Spouse's Signature. If a Joint Return, Both Must Sign. Date          Spouse's Occupation
QUALITY INSPECTOR

May the IRS discuss this return with the preparer shown below (see instructions)? ☒ Yes ☐ No

**Paid Preparer's Use Only**

Preparer's Signature ►          Date 04/03/2001 Check if self-employed ☒          Preparer's SSN or PTIN 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

Firm's Name (or yours if self-employed), Address, and ZIP Code ►
FAYES TAX SERVICE
1210 E.2ND ST.
NATIONAL CITY          CA 91950

EIN
Phone No. (619) 474-4221

Form 1040 (2000)

FDIA0112 10/30/00

OMB No. 1545-0074

**Schedule A**
**(Form 1040)**

Department of the Treasury
Internal Revenue Service (99)

## Itemized Deductions

► Attach to Form 1040.
► See Instructions for Schedule A (Form 1040).

**2000**

07

Name(s) Shown on Form 1040

Your Social Security Number

| | | | | |
|---|---|---|---|---|
| **Medical and Dental Expenses** | | Caution. Do not include expenses reimbursed or paid by others. | | |
| | 1 | Medical and dental expenses (see instructions) | 1 | |
| | 2 | Enter amount from Form 1040, line 34 ..... 2 | | |
| | 3 | Multiply line 2 above by 7.5% (.075) | 3 | |
| | 4 | Subtract line 3 from line 1. If line 3 is more than line 1, enter -0- | | 4 |
| **Taxes You Paid** (See Instructions.) | 5 | State and local income taxes | 5 | 2,991. |
| | 6 | Real estate taxes (see instructions) | 6 | 2,000. |
| | 7 | Personal property taxes | 7 | 950. |
| | 8 | Other taxes. List type and amount ► _ _ _ _ _ _ _ _ _ _ _ | 8 | |
| | 9 | Add lines 5 through 8 | | 9 | 5,941. |
| **Interest You Paid** (See Instructions.) **Note. Personal interest is not deductible.** | 10 | Home mortgage interest and points reported to you on Form 1098 | 10 | 20,372. |
| | 11 | Home mortgage interest not reported to you on Form 1098. If paid to the person from whom you bought the home, see instructions and show that person's name, identifying number, and address ► _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | 11 | |
| | 12 | Points not reported to you on Form 1098. See instructions for special rules | 12 | |
| | 13 | Investment interest. Attach Form 4952 if required. (See instructions.) | 13 | |
| | 14 | Add lines 10 through 13 | | 14 | 20,372. |
| **Gifts to Charity** If you made a gift and got a benefit for it, see instructions. | 15 | Gifts by cash or check. If you made any gift of $250 or more, see instructions | 15 | 8,000. |
| | 16 | Other than by cash or check. If any gift of $250 or more, see instructions. You must attach Form 8283 if over $500 | 16 | 2,800. |
| | 17 | Carryover from prior year | 17 | |
| | 18 | Add lines 15 through 17 | | 18 | 10,800. |
| **Casualty and Theft Losses** | 19 | Casualty or theft loss(es). Attach Form 4684. (See instructions.) | 19 | |
| **Job Expenses and Most Other Miscellaneous Deductions** (See instructions for expenses to deduct here.) | 20 | Unreimbursed employee expenses — job travel, union dues, job education, etc. You must attach Form 2106 or 2106-EZ if required. (See instructions.) ► _ _ _ _ _ _ _ _ _ _ | 20 | |
| | 21 | Tax preparation fees | 21 | 160. |
| | 22 | Other expenses — investment, safe deposit box, etc. List type and amount ► See Statement _ _ _ _ _ _ _ _ 2,233. | 22 | 2,233. |
| | 23 | Add lines 20 through 22 | 23 | 2,393. |
| | 24 | Enter amount from Form 1040, line 34 ..... 24 86,459. | | |
| | 25 | Multiply line 24 above by 2% (.02) | 25 | 1,729. |
| | 26 | Subtract line 25 from line 23. If line 25 is more than line 23, enter -0- | | 26 | 664. |
| **Other Miscellaneous Deductions** | 27 | Other — from list in the instructions. List type and amount ► _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | 27 | |
| **Total Itemized Deductions** | 28 | Is Form 1040, line 34, over $128,950 (over $64,475 if married filing separately)? | | | |
| | | [X] **No.** Your deduction is not limited. Add the amounts in the far right column for lines 4 through 27. Also, enter this amount on Form 1040, line 36. | ► 28 | 37,777. |
| | | [ ] **Yes.** Your deduction may be limited. See instructions for the amount to enter. | | |

**BAA For Paperwork Reduction Act Notice, see separate instructions.**

Schedule A (Form 1040) 2000

FDIA0301 10/25/00

| Schedule A | **Miscellaneous Itemized Deductions Statement** | **2000** |
| Lines 20, 22, 27 | ► Attach to return (after all IRS forms) | **Statement** |

| Name(s) Shown on Return | Social Security Number |
|---|---|
| | |

## Employee Business Expenses — Subject to 2% Limitation

| | | | |
|---|---|---|---|
| 1 | Unreimbursed employee expenses from Form 2106 .......................... | 1 | |
| 2 | Excluded expenses from Form 2555 ................................. | 2 | |
| 3 | Other unreimbursed employee business expenses: | | |
| a | Union and professional dues ...................................... | 3 a | |
| b | Professional subscriptions ........................................ | b | |
| c | Uniforms and protective clothing ................................ | c | |
| d | Job search costs ................................................ | d | |
| e | Other: | e | |
| | | | |
| 4 | Total unreimbursed employee business expenses ................... | 4 | |

## Miscellaneous Expenses — Subject to 2% Limitation    Investment Expense ↓

| | | | |
|---|---|---|---|
| 5 | Depreciation and amortization deductions ........................ | 5 | |
| 6 | Casualty/theft losses of property used in services as an employee ....... | 6 | |
| 7 | REMIC expenses, from Schedule E ................................ | 7 | |
| 8 | Investment expenses related to interest and dividend income .......... | 8 | |
| 9 | Deductions related to portfolio income, miscellaneous deductions, and excess deductions on termination, from Schedule(s) K-1 ............... | 9 | |
| 10 | Miscellaneous deductions excluded on Form 2555 .................. | 10 | |
| 11 | Other miscellaneous expenses: | | |
| a | Investment counsel and advisory fees ........................... | 11 a | |
| b | Certain attorney and accounting fees ............................ | b | |
| c | Safe deposit box rental fees ................................... | c | |
| d | IRA custodial fees ............................................. | d | |
| e | Other: | e | |
| | UNIFORMS (NET AFTER ALLOW) | | 1,298. |
| | UNIFORMS UPKEEP | | 425. |
| | SAFETY SHOES | | 510. |
| 12 | Total miscellaneous expenses ................................... | 12 | 2,233. |

## Other Miscellaneous Deductions — Not Subject to 2% Limitation

| | | | |
|---|---|---|---|
| 13 | Federal estate tax paid on decedent's income reported on this return ........ | 13 | |
| 14 | Miscellaneous deductions excluded on Form 2555 .................. | 14 | |
| 15 | Impairment-related expenses of a handicapped employee, from Form 2106 .. | 15 | |
| 16 | Amortizable bond premiums on bonds acquired before 10/23/86 ............ | 16 | |
| 17 | Gambling losses (to the extent of gambling income) ..................... | 17 | |
| 18 | Casualty/theft losses of income-producing property ..................... | 18 | |
| 19 | Other miscellaneous deductions: | 19 | |
| | | | |
| 20 | Total other miscellaneous deductions ........................... | 20 | |

Form **8283**
(Rev October 1998)

Department of the Treasury
Internal Revenue Service

**Noncash Charitable Contributions**

► Attach to your tax return if you claimed a total deduction
of over $500 for all contributed property.
► See separate instructions.

OMB No. 1545-0908

**55**

Name(s) Shown on Your Income Tax Return | Identifying Number

**Note:** *Figure the amount of your contribution deduction before completing this form. See your tax return instructions.*

**Section A —** List in this section only items (or groups of similar items) for which you claimed a deduction of $5,000 or less. Also, list certain publicly traded securities even if the deduction is over $5,000 (see instructions).

**Part I    Information on Donated Property —** If you need more space, attach a statement.

1

| | (a) Name and address of the donee organization | (b) Description of donated property |
|---|---|---|
| A | AMVETS SAN DIEGO, CA | CLOTHINGS, DRESS SHOES, POTS & PANS, RUGS, DRAPERIES, MIX FURNITURES, |
| B | AMVETS SAN DIEGO, CA | LAMPS, SMALL APPL., KNICKNACKS, WASHER, TV, EXERCISER EQUIP., BIKE, |
| C | AMVETS SAN DIEGO, CA | SOFT COVER POCKET BOOKS, MIX BOOKS, TOYS, CANNED/DRY GOODS, TOOLS, |
| D | SALVATION ARMY, SAN DIEGO, CA | VIDEO MOVIE TAPES, RECORDS, TAPES, BOWLING BALL WITH BAG, PAINTINGS, |
| E | SALVATION ARMY SAN DIEGO, CA | POSTERS, AND LOTS OF MISCL. |

**Note:** *If the amount you claimed as a deduction for an item is $500 or less, you do not have to complete columns (d), (e), and (f).*

| | (c) Date of the contribution | (d) Date acquired by donor (mo, yr) | (e) How acquired by donor | (f) Donor's cost or adjusted basis | (g) Fair market value | (h) Method used to determine the fair market value |
|---|---|---|---|---|---|---|
| A | Various | | | | $ 2,800 | COMPARABLE APPROACH |
| B | | | | | | |
| C | | | | | | |
| D | | | | | | |
| E | | | | | | |

**Part II    Other Information —** Complete line 2 if you gave less than an entire interest in property listed in Part I. Complete line 3 if conditions were attached to a contribution listed in Part I.

2  If, during the year, you contributed less than the entire interest in the property, complete lines a - e.

a Enter the letter from Part I that identifies the property  ► _____ . If Part II applies to more than one property, attach a separate statement.

b Total amount claimed as a deduction for the property listed in Part I:  (1)   For this tax year ..................... ► _____
(2)   For any prior tax years .............. ► _____

c Name and address of each organization to which any such contribution was made in a prior year (complete only if different than the donee organization above):

Name of Charitable Organization (donee)
_____

Address (number, street, and room or suite no.)
_____

City or Town                                    State   ZIP Code

d For tangible property, enter the place where the property is located or kept ► _____

e Name of any person, other than donee organization, having actual possession of the property ► _____

3  If conditions were attached to any contribution listed in Part I, answer questions a - c and attach the required statement (see instructions):

| | | Yes | No |
|---|---|---|---|
| a Is there a restriction, either temporary or permanent, on the donee's right to use or dispose of the donated property? ........... | | | |
| b Did you give to anyone (other than the donee organization or another organization participating with the donee organization in cooperative fundraising) the right to the income from the donated property or to the possession of the property, including the right to vote donated securities, to acquire the property by purchase or otherwise, or to designate the person having such income, possession, or right to acquire? ................................................................ | | | |
| c Is there a restriction limiting the donated property for a particular use? .................................................. | | | |

BAA  For Paperwork Reduction Act Notice, see separate instructions.                    Form **8283** (Rev 10-98)

Duty Agent — San Diego FO

SAN DIEGO CA 921
PM
26 FEB
2002

INTERNAL REVENUE SERVICE
Attn: Public Affairs Office   C I
P.O. Box 30210
Lagunal Niguel, CA 92677

RECEIVED
INTERNAL REVENUE SERVICE
MAR 11 2002
CRIMINAL INVESTIGATION DIVISION.
SAN DIEGO. CALIFORNIA

32607+0210

**Internal Revenue Service**
United States Department of the Treasury

# Non-Custody Statement of Rights

(At the outset of your first official meeting with the subject of an investigation, **identify yourself as a special agent of the IRS and produce authorized credentials.** THEN STATE:)

" As a special agent, one of my functions is to investigate the possibility of criminal violations of the Internal Revenue laws, and related offenses.
" In connection with my investigation of your tax liability (or other matter), I would like to ask you some questions. However, first I advise you that under the 5th Amendment to the Constitution of the U.S., I cannot compel you to answer any questions or to submit any information if such answers or information might tend to incriminate you in any way. I also advise you that anything which you say and any documents which you submit may be used against you in any criminal proceeding which may be undertaken. I advise you further that you may, if you wish, seek the assistance of any attorney before responding.

" Do you understand these rights? "

*Official Use Only*
publish.no.irs.gov

Close

GOVERNMENT
EXHIBIT

3

# Voluntary Consent to a Search of Person, Premises, or Conveyance

## Statement of Rights

Before we search your premises (or person or conveyance) you should be aware of your rights under the Fourth Amendment to the Constitution.

You have the right to refuse to permit us to enter your premises (or to search your person or conveyance).

If you voluntarily permit us to enter and search your premises (or to search your person or conveyance) any incriminating evidence that we find may be used against you in court, or other proceedings.

Prior to permitting us to search, you have the right to require us to secure a search warrant.

## Waiver

I have read the above statement of my rights and, fully understanding these rights, I waive them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity.

**Person, premises or conveyance to be searched:**

**Location of search:**

2642 Broadrick Way, San Diego, CA 92139

**Date:** Dec. 10, 2003

**Time:** 12:15 pm

(1) Wickstrom
A.S. Barwin 12/10/03

Name

Witness:

_Maria Alvarez - Special Agent_       _Jon Bradley - Special Agent_

Name                                   Special Agent

_Edward A. R__ SPECIAL AGENT_       _Jaris Haar Special Agent_

Name                                   Title

12:15 pm   12/10/03

**GOVERNMENT EXHIBIT**

**4**

Form **6884** (8-82)                Department of the Treasury - Internal Revenue Service

AND GREG M. GARRETT

I, FE S. GARRETT, CONSENT TO TURNING OVER RECORDS DETAILED IN THE ATTACHED 15 PAGES TO AGENTS OF THE INTERNAL REVENUE SERVICE. THE RECORDS WERE FOUND AT 2642 BROADRICK WAY, SAN DIEGO, CA 92139 ON DECEMBER 10, 2003.

_____
FE S. GARRETT

_____
GREG M. GARRETT

12/10/03
DATE

12/10/03
DATE

WITNESS:

_____
EDWARD REYES

_____
LEN BRADLEY

12/10/03
DATE

12/10/03
DATE

I, DULCE WICKSTROM, CONSENT TO TURNING OVER RECORDS DETAILED ON THE ATTACHED 15 PAGES TO AGENTS OF THE INTERNAL REVENUE SERVICE, THE RECORD WERE FOUND AT MY RESIDENCE LOCATED AT 2642 BROADRICK WAY, SAN DIEGO, CA 92139 ON DECEMBER 10, 2003.


_____          12/10/03
DULCE WICKSTROM                          DATE


_____          12/10/03
EDWARD REYES, SPECIAL AGENT              DATE

_____          12/10/03
TONI HAAS, SPECIAL AGENT                 DATE

1
2
3
4
5              **UNITED STATES DISTRICT COURT**
6              **SOUTHERN DISTRICT OF CALIFORNIA**
7

8    UNITED STATES OF AMERICA,              CASE NO. 07cr0491 BTM
9                               Plaintiff,   **ORDER DENYING DEFENDANT'S**
                                             **MOTION TO DISMISS THE**
10          v.                               **INDICTMENT**

11   MANUEL MARTINEZ-COVARRUBIAS,
12                              Defendant.
13

14          Defendant Manuel Martinez-Covarrubias has filed a Motion to Dismiss the Indictment
15   Due to Erroneous Grand Jury Instruction.  For the reasons discussed below, Defendant's
16   motion is **DENIED**.

17                          **I.  BACKGROUND**

18          On February 28, 2007, a federal grand jury empaneled in this district on January 11,
19   2007 returned a two-count Indictment charging Defendant with Importation of
20   Methamphetamine, in violation of 21 U.S.C. §§ 952 and 960, and Possession of
21   Methamphetamine with Intent to Distribute, in violation of 21 U.S.C. § 841(a)(1).

22

23                      **II.  CHALLENGED INSTRUCTIONS**

24   A.  Video Presentation

25          Prior to the selection of the grand jury jury, the potential grand jurors were shown a
26   video titled "The Federal Grand Jury: The People's Panel."  The video's apparent purpose
27   is to educate potential grand jurors about their civic duty to serve, the function of the grand
28   jury, and their responsibilities as grand jurors.

                                    1                              07cr0491 BTM

GOVERNMENT
EXHIBIT

**5**

1   The video presents the story of a woman who serves on a grand jury for the first time.

2   In one scene, after the woman receives the summons, her son tells her what he has learned

3   about the function of a grand jury.  Reading from a civics book, the son states that if the "jury

4   finds that probable cause does exist, then it will return a written statement of charges called

5   an indictment . . . ."

6   When charging the impaneled grand jury, the fictional judge explains that if the grand

7   jury finds that there is probable cause, "you will return an indictment."

8   Later, the foreperson tells the other grand jurors that there are two purposes of the

9   grand jury: (1)  when there is a finding of probable cause, to bring the accused to trial fairly

10   and swiftly; and (2) to protect the innocent against unfounded prosecution.

11

12   B. Voir Dire Session

13   Before commencing voir dire, the empaneling judge, the Hon. Larry A. Burns,

14   explained the function of the grand jury to the prospective jurors as follows: "The grand jury

15   is determining really two factors: 'Do we have a reasonable – collectively, do we have a

16   reasonable belief that a crime was committed? And second, do we have a reasonable belief

17   that the person that they propose that we indict committed the crime?'  If the answer is 'yes'

18   to both of those, then the case should move forward.  If the answer to either of the questions

19   is 'no,' then the grand jury should hesitate and not indict." App. 2 to Gov't Response at 8.

20   During voir dire, Judge Burns explained to the potential grand jurors that the

21   presentation of the evidence to the grand jury was going to be one-sided.  Id. at 14.

22   However, Judge Burns stated, "Now, having told you that, my experience is that the

23   prosecutors don't play hide-the-ball.  If there's something adverse or that cuts against the

24   charge, you'll be informed of that.  They have a duty to do that." Id. at 14-15.

25   One prospective juror, a retired clinical social worker, indicated that he did not believe

26   that any drugs should be considered illegal.  Id. at 16.  He also stated that he had strong

27   feelings about immigration cases and thought the government was spending a lot of time

28   unnecessarily persecuting people.  Id.  The following exchange occurred:

The Court: Now, the question is can you fairly evaluate those cases? Just as the Defendant ultimately is entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment. If there's probable cause, then the case should go forward. I wouldn't want you to say, "Well, yeah, there's probable cause. But I still don't like what our Government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that's your frame of mind, then probably you shouldn't serve. Only you can tell me that.

Prospective Juror: Well, I think I may fall in that category.

The Court: In the latter category?

Prospective Juror: Yes.

The Court: Where it would be difficult for you to support a charge even if you thought the evidence warranted it?

Prospective Juror: Yes.

The Court: I'm going to excuse you, then. I appreciate your honest answers.

Id. at 16-17.

Later, another prospective juror, a real estate agent, expressed a concern regarding the disparity between state and federal law with respect to medical marijuana. Judge Burns responded:

Well, those things – the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that – we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that. We want you to make a business-like decision and look at the facts and make a determination of whether there was a [sic] probable cause.

Id. at 25.

Subsequently, the prospective juror stated that he felt that drugs should be legal and that rapists and murderers, not people using drugs, should go to jail. Id. at 25-26. The following exchange ensued:

The Court: I think rapists and murderers ought to go to jail too. It's not for me as a judge to say what the law is. We elect legislators to do that. We're sort of at the end of the pipe on that. We're charged with enforcing the laws that Congress gives us.

I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make. But my alternative is to vote for someone different, vote for someone that supports the policies I support and get the law changed. It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."

You'd have a similar obligation as a grand juror even though you might

3

have to grit your teeth on some cases.  Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana.  I don't know if that's it but you'd vote against criminalizing some drugs.

That's not what your prerogative is here.  Your prerogative instead is to act like a judge and to say, "All right.  This is what I've got to deal with objectively.  Does it seem to me that a crime was committed?  Yes.  Does it seem to me that this person's involved?  It does."  And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward.

I can understand if you tell me, "Look, I get all that, but I just can't do it or I wouldn't do it."  I don't know what your frame of mind is.  You have to tell me about that.

Prospective Juror: I'm not comfortable with it.

The Court: Do you think you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?

Prospective Juror: It would depend upon the case.

The Court: Is there a chance that you would do that?

Prospective Juror: Yes.

The Court: I appreciate your answers.  I'll excuse you at this time.

Id. at 26-28.

Later, a potential juror said that he was "soft" on immigration because he had done volunteer work with immigrants in the field, but that he could be fair and objective.  Judge Burns stated: "As you heard me explain earlier to one of the prospective grand jurors, we're not about trying to change people's philosophies and attitudes here.  That's not my business.  But what I have to insist on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws here."  Id. at 61.  This juror was not excused.

C.  Charge to Impaneled Grand Jury

After the grand jury was impaneled, Judge Burns gave further instructions regarding the responsibilities of the grand jurors.

With respect to the enforcement of federal laws, Judge Burns explained:

But it's not for you to judge the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity is [sic] criminal is not up to you.  That's a judgment that Congress makes.

And if you disagree with that judgment made by Congress, then your

4

07cr0491 BTM

1    option is not to say, 'Well, I'm going to vote against indicting even though I
2    think that the evidence is sufficient' or 'I'm going to vote in favor of [indictment]
     even though the evidence may be insufficient.' Instead, your obligation is to
3    contact your congressman or advocate for a change in the laws, but not to
     bring your personal definition of what the law ought to be and try to impose that
     through applying it in a grand jury setting.
4            Furthermore, when you're deciding whether to indict or not to indict, you
5    shouldn't be concerned with punishment that attaches to the charge. I think
     I also alluded to this in the conversation with one gentleman. Judges alone
6    determine punishment. We tell trial juries in criminal cases that they're not to
     be concerned with the matter of punishment either. Your obligation at the end
7    of the day is to make a business-like decision on facts and apply those facts
     to the law as it's explained and read to you.

8    App. 1 to Gov't Response at 8-9.

9        With respect to exculpatory evidence, Judge Burns stated: "As I told you, in most

10   instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they

11   may be asking you to do if they're aware of that evidence." Id. at 20.   Later, Judge Burns

12   said, "If past experience is any indication of what to expect in the future, then you can expect

13   that the U.S. Attorneys that will appear in front of you will be candid, they'll be honest, that

14   they'll act in good faith in all matters presented to you." Id. at 27.

15

16                                  **III. DISCUSSION**

17

18   A. Instructions Re: Role of Grand Jury

19       Defendant contends that statements made in the video, Judge Burns' instructions, and

20   the dismissal of two potential jurors deprived Defendant of the traditional functioning of the

21   Grand Jury.  Specifically, Defendant claims that the challenged statements in combination

22   with the dismissal of the two potential jurors "flatly prohibited grand jurors from exercising

23   their constitutional discretion to not indict even if probable cause supports the charge."

24   (Def.'s Reply Br. 8.)  Looking at the video presentation and the instructions as a whole, the

25   Court disagrees.

26       Judge Burns made it clear that the jurors were not to refuse to indict in the face of

27   probable cause *on the ground that they disagreed with Congress's decision to criminalize*

28   *certain activity.*  Judge Burns did not err in doing so.  In United States v. Navarro-Vargas, 408

                                           5

F.3d 1184 (9th Cir. 2005) ("Navarro-Vargas II"), the Ninth Circuit upheld the model grand jury instruction that states: "You cannot judge the wisdom of the criminal laws enacted by Congress, that is, whether or not there should or should not be a federal law designating certain activity as criminal.  That is to be determined by Congress and not by you."   The majority opinion observed that the instruction was not contrary to any long-standing historical practice surrounding the grand jury and noted that shortly after the adoption of the Bill of Rights, federal judges charged grand juries with a duty to submit to the law and to strictly enforce it.  Id. at 1193,1202-03.   "We cannot say that the grand jury's power to judge the wisdom of the laws is so firmly established that the district court must either instruct the jury on its power to nullify the laws or remain silent."  Id. at 1204.

A prohibition against judging the wisdom of the criminal laws enacted by Congress amounts to the same thing as a prohibition against refusing to indict based on disagreement with the laws.  It is true that Judge Burns used stronger language that, viewed in isolation, could be misconstrued as requiring the return of an indictment in *all* cases where probable cause can be found.  Particularly troubling is the following statement made to the real estate agent: "Your prerogative instead is to act like a judge and to say, 'All right.  This is what I've got to deal with objectively.  Does it seem to me that a crime was committed?  Yes.  Does it seem to me that this person's involved?  It does.'  *And then your obligation*, if you find those things to be true, *would be to vote in favor of the case going forward.*"  App. 2 to Gov't Response at 26.  However, viewed in context, Judge Burns was not mandating the issuance of an indictment in *all* cases where probable cause is found; he was explaining that disagreement with the laws should not be an obstacle to the issuance of an indictment.[1]

Furthermore, the word "obligation" is not materially different than the word "should."

---

[1]   The Supreme Court has recognized that a grand jury is not required to indict in every case where probable cause exists.  In Vasquez v. Hillery, 474 U.S. 254, 263 (1986), the Supreme Court explained: "The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not.  In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a noncapital offense - all on the basis of the same facts.  Moreover, '[t]he grand jury is not bound to indict in every case where a conviction can be obtained.' United States v. Ciambrone, 601 F.2d 616, 629 (2d Cir. 1979) (Friendly, J., dissenting)."

6

In <u>Navarro-Vargas II</u>, the majority opinion held that the model instruction that the jurors "should" indict if they find probable cause does not violate the grand jury's independence. The majority explained, "As a matter of pure semantics, it does not 'eliminate discretion on the part of the grand jurors,' leaving room for the grand jury to dismiss even if it finds probable cause." <u>Navarro-Vargas II</u>, 408 F.3d at 1205 (quoting <u>United States v. Marcucci</u>, 299 F.3d 1156, 1159 (9th Cir. 2002)).  The dissenting opinion notes that the word "should" is used "to express a duty [or] *obligation*." <u>Id.</u> at 1121 (quoting The Oxford American Diction And Language Guide 931 (1999))(emphasis added).[2]

Defendant points to the language in the video where first the son, then the judge, state that if there is a finding of probable cause, the grand jury "will" return an indictment. However, no emphasis is placed on the word "will."  As spoken by the actors, the statements are not directives, mandating the return of an indictment upon the finding of probable cause, but, rather, descriptions of what is expected to occur.  Similarly, the foreperson's statement that one of the purposes of the grand jury is to bring an accused to trial when there is a finding of probable cause is a general statement of the grand jury's function, not a command to return an indictment in *every* case where probable cause exists.

Defendant also argues that Judge Burns improperly forbade the grand jury from considering the potential punishment for crimes when deciding whether or not to indict. Defendant relies on the following statement:

> Well, those things – the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that – we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. *We'd ask you to also abide by that.*  We want you to make a business-like decision and look at the facts and make a determination of whether there was a probable cause.

App. 2 to Gov't Response at 25.  (Emphasis added.)  Although Judge Burns stated that trial jurors *cannot* consider punishment, he did not impose such a restriction on the grand jurors. Instead, Judge Burns *requested* that the grand jurors follow the same principle.  Similarly,

---

[2]  Defendant concedes that at other times Judge Burns instructed that upon a finding of probable cause, the case "should" go forward.  App. 2 to Gov't Response at 8, 17; App. 1 to Gov't Response at 4, 23.

07cr0491 BTM

1  during the formal charge, Judge Burns stated, "[y]ou *shouldn't* be concerned with punishment

2  that attaches to the charge."  App. 1 to Gov't Response at 8.  (Emphasis added.)

3       In United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006), the Ninth Circuit

4  upheld a jury instruction that stated: "[W]hen deciding whether or not to indict, you *should not*

5  be concerned about punishment in the event of conviction; judges alone determine

6  punishment." (Emphasis added.)  Consistent with the reasoning in Marcucci and Navarro-

7  Vargas II, the Ninth Circuit held that the instruction did not place an absolute bar on

8  considering punishment and was therefore constitutional.  The instructions given by Judge

9  Burns regarding the consideration of punishment were substantially the same as the

10  instruction in Cortez-Rivera.

11       Neither Judge Burns nor the video pronounced a general prohibition against jurors

12  exercising their discretion to refuse to return an indictment in the face of probable cause.

13  In any case, "history demonstrates that grand juries do not derive their independence from

14  a judge's instruction.  Instead they derive their independence from an unreviewable power

15  to decide whether to indict or not."  Navarro-Vargas II, 408 F.3d at 1204.

16       Both the video and Judge Burns informed the jurors about the utmost secrecy of the

17  grand jury proceedings and their deliberations.  The video and Judge Burns also emphasized

18  to the jury that they were independent of the Government and did not have to return an

19  indictment just because the Assistant U.S. Attorney asked them to.  In the video, the judge

20  expressed approval at the fact that the grand jury did not return an indictment as to the

21  alleged driver of the get-away car. Judge Burns characterized the jury as "a buffer between

22  our Government's ability to accuse someone of a crime and then putting that person through

23  the burden of standing trial."  App. 1 to Gov't Response at 26.  Judge Burns also told the

24  jurors that they were not to be a "rubber stamp" and were expected to depend on their

25  independent judgment.  Id, at 27.

26       Even though the jurors were not explicitly instructed that they could use their

27  discretion to refuse to return an indictment, they retained that power by virtue of the secrecy

28  surrounding their deliberations and the unreviewability of their decisions.  Nothing that Judge

07cr0491 BTM

1  Burns said or did impinged on the jurors' independence in this regard.

2       Defendant counters that the dismissal of the two potential jurors undermined the grand

3  jury's independence from the very start.  According to Defendant, when Judge Burns

4  dismissed the jurors, the message was clear that they were to indict in every case where

5  there was probable cause or they would be excused.  Defendant contends that the remaining

6  grand jurors could not have understood Judge Burns' actions in any other way.  (Reply Br.

7  18.)  The Court disagrees.

8       Upon reading the voir dire transcript, it is apparent that the jurors were excused

9  because they were biased against the government with respect to a whole category of

10  criminal laws, not simply because they were independent-minded and might refuse to return

11  an indictment in a case where probable cause exists.  Judge Burns explained to the clinical

12  social worker, "We're all products of our experience.  We're not going to try to disabuse you

13  of experiences or judgments that you have.  What we ask is that you not allow those to

14  control invariably the outcome of the cases coming in front of you; that you look at the cases

15  fresh, you evaluate the circumstances, listen to the witness testimony, and then make an

16  independent judgment."  App. 2 to Gov't Response at 15.  Judge Burns excused the social

17  worker after he admitted that it would be difficult for him to return an indictment in drug or

18  immigration cases.

19       Similarly, the real estate agent expressed that he thought drugs should be legal and

20  that people using drugs should not be sent to jail.  App. 2 to Gov't Response at 25-26.   The

21  real estate agent said that he was not comfortable with indicting in drug cases.  Although he

22  did not say that he would refuse to indict in all cases involving drugs, he admitted that

23  because of his beliefs, there was a chance that he would refuse to return an indictment in a

24  drug case even though there was probable cause.  Id. at 27.  The real estate agent's

25  responses established that he had serious concerns regarding the criminalization of drugs

26  and could not be impartial with respect to these cases

27       That bias was the reason for the dismissal of the first two potential  jurors is confirmed

28  by the dismissal of a third potential juror.  This juror stated that he had a strong bias for the

9

1   Government.  App. 2 to Gov't Response at 38.  Judge Burns cautioned the juror that he

2   should not "automatically defer to [the Government] or surrender the function and give the

3   indictment decision to the U.S. Attorney.  You have to make that independently."  Id. at 40.

4   Judge Burns emphasized once again the responsibility of the jurors to evaluate the facts of

5   each case independently based on the evidence presented.  Id. at 42-43.  Demonstrating his

6   even-handedness, Judge Burns explained, "I'm equally concerned with somebody who would

7   say, 'I'm going to automatically drop the trap door on anybody the U.S. Attorney asks.'  I

8   wouldn't want you to do that."  Id. at 44.

9        A reasonable grand juror would not have interpreted the dismissal of the first two

10  potential jurors as a message that they must indict in all cases where probable cause is

11  found or risk being excused from service.  It was apparent to the other jurors that a lack of

12  impartiality with respect to certain types of cases, *not* independence, was the reason for all

13  three dismissals.

14       In sum, Judge Burns did not err in instructing the grand jurors that they were not to

15  refuse to return an indictment on the ground that they disagreed with the laws.  Furthermore,

16  nothing in the video or Judge Burns' instructions nullified the grand jury's inherent power to

17  refuse to indict for any reason whatsoever.  As the Ninth Circuit noted in Navarro-Vargas II,

18  408 F.3d at 1204, the grand jury's independence results from the secrecy of their

19  deliberations and the unreviewability of their decisions.  Nothing in the record shows any

20  impediment to that independence.

21

22  B.    Instructions re: Assistant U.S. Attorneys

23       Defendant also contends that Judge Burns committed structural error by making

24  comments about the Assistant U.S. Attorney's duty to present evidence that "cuts against the

25  charge."  According to Defendant, not only did Judge Burns' comments contradict United

26  States v. Williams, 504 U.S. 36 (1992), but also discouraged independent investigation,

27  leading to inaccurate probable cause determinations.  Defendant reasons that given Judge

28  Burns' comments, the grand jurors would have assumed that if the prosecutor did not present

1   any exculpatory evidence, then none exists, rendering further investigation a waste of time.

2       Under <u>Williams</u>, prosecutors do not have a duty to present substantial exculpatory

3   evidence to the grand jury. Although Assistant U.S. Attorneys apparently have an

4   employment duty to disclose "substantial evidence that directly negates the guilt" of a subject

5   of investigation (United States Attorneys' Manual § 9-11.233), it does not appear that they

6   have a broad duty to disclose all evidence that may be deemed exculpatory or adverse to

7   the Government's position.

8       Accordingly, Judge Burns' comments regarding the duty of Assistant U.S. Attorneys

9   to present adverse evidence were inaccurate. However, Judge Burns' comments do not rise

10  to the level of structural error. As discussed above, the video and Judge Burns stressed that

11  the grand jury was independent of the Government. The video and Judge Burns also

12  explained to the jury that they could direct the Assistant U.S. Attorney to subpoena additional

13  documents or witnesses. App. 1 to Gov't Response at 11, 24. The jurors were also told

14  about their right to pursue their own investigation, even if the Assistant U.S. Attorney

15  disagrees with the grand jury's decision to pursue the subject. <u>Id.</u> at 12.

16      In light of the foregoing instructions, the Court does not agree that the grand jurors

17  would assume that if the Government did not present any exculpatory evidence, none exists.

18  A reasonable juror would understand that the Assistant U.S. Attorney may not be aware of

19  certain exculpatory evidence, whether due to legitimate circumstances or inadequate

20  investigation, and that further investigation by the grand jury may be needed to properly

21  evaluate the evidence before them. Furthermore, Judge Burns told the jury that "in *most*

22  instances" the U.S. Attorneys are duty-bound to present exculpatory evidence. App. 1 to

23  Gov't Response at 20. Based on this qualifying language, the grand jurors would have

24  understood that the prosecutor is not always bound to present exculpatory evidence. Thus,

25  "the structural protections of the grand jury" have not "been so compromised as to render the

26  proceedings fundamentally unfair." <u>Bank of Nova Scotia v. United States</u>, 487 U.S. 250, 257

27  (1988).

28      If Defendant can establish that the Government in fact knew of exculpatory evidence

11

1  that was not presented to the grand jury and that this failure to present exculpatory evidence,

2  in conjunction with Judge Burns' comments, "substantially influenced the grand jury's

3  decision to indict" or raises "grave doubt" that the decision to indict was free from the

4  substantial influence of such events, the Court may dismiss the indictment under its

5  supervisory powers. <u>Bank of Nova Scotia</u>, 487 U.S. at 256. Therefore, the Court will grant

6  Defendant leave to conduct discovery regarding what evidence was presented to the grand

7  jury. If, based upon the discovery, Defendant can establish that he suffered actual prejudice,

8  Defendant may renew his motion to dismiss the indictment.

9

10                           **IV. <u>CONCLUSION</u>**

11          For the reasons discussed above, Defendant's Motion to Dismiss the Indictment Due

12  to Erroneous Grand Jury Instruction is **DENIED WITHOUT PREJUDICE**.

13

14  **IT IS SO ORDERED.**

15

    DATED:  October 11, 2007

16

17                                        _Barry Ted Moskowitz_

18                                        Honorable Barry Ted Moskowitz
                                          United States District Judge

19

20

21

22

23

24

25

26

27

28

                                          12                              07cr0491 BTM

1
2
3
4
5 **UNITED STATES DISTRICT COURT**
6 **SOUTHERN DISTRICT OF CALIFORNIA**
7
8 UNITED STATES OF AMERICA,                CASE NO. 07cr1372 JAH

9                              Plaintiff,   **AMENDED ORDER DENYING DEFENDANT'S MOTION TO**
10    v.                                    **DISMISS THE INDICTMENT**
11 DIANA JIMENEZ-BERMUDEZ,
12                              Defendant.
13

14     Defendant Diana Jimenez-Bermudez has filed a Motion to Dismiss the Indictment

15 Due to Erroneous Grand Jury Instruction.  For the reasons discussed below, Defendant's

16 motion is **DENIED**.

17                          **I.  BACKGROUND**

18     On February 28, 2007, a federal grand jury empaneled in this district on January

19 11, 2007 returned a two-count Indictment charging Defendant with Importation of

20 Methamphetamine, in violation of 21 U.S.C. §§ 952 and 960, and Possession of

21 Methamphetamine with Intent to Distribute, in violation of 21 U.S.C. § 841(a)(1).

22                   **II.  CHALLENGED INSTRUCTIONS**[1]

23 A. **Voir Dire Session**

24     Before commencing voir dire, the empaneling judge, the Hon. Larry A. Burns,

25 explained the function of the grand jury to the prospective jurors as follows: "The grand

26

27         [1]In her reply brief, Defendant makes a passing reference to the fact that the grand
28 jurors were shown a video presentation on the role of the grand jury, however there is no
substantive challenge to the use of the video, and thus use of the video will not be
discussed in depth herein.

1

GOVERNMENT
EXHIBIT
**6**

07cr1372 JAH

jury is determining really two factors: 'Do we have a reasonable – collectively, do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?'  If the answer is 'yes' to both of those, then the case should move forward.  If the answer to either of the questions is 'no,' then the grand jury should hesitate and not indict."  App. 2 to Gov't Response at 8.

During voir dire, Judge Burns explained to the potential grand jurors that the presentation of the evidence to the grand jury was going to be one-sided.  Id. at 14.  However, Judge Burns stated, "Now, having told you that, my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or that cuts against the charge, you'll be informed of that.  They have a duty to do that."  Id. at 14-15.

One prospective juror, a retired clinical social worker, indicated that he did not believe that any drugs should be considered illegal.  Id. at 16.  He also stated that he had strong feelings about immigration cases and thought the government was spending a lot of time unnecessarily persecuting people.  Id.  The following exchange occurred:

> The Court:  Now, the question is can you fairly evaluate those cases?  Just as the Defendant ultimately is entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment.  If there's probable cause, then the case should go forward.  I wouldn't want you to say, "Well, yeah, there's probable cause.  But I still don't like what our Government is doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that's your frame of mind, then probably you shouldn't serve.  Only you can tell me that.
>
> Prospective Juror: Well, I think I may fall in that category.
>
> The Court: In the latter category?
>
> Prospective Juror: Yes.
>
> The Court: Where it would be difficult for you to support a charge even if you thought the evidence warranted it?
>
> Prospective Juror: Yes.
>
> The Court: I'm going to excuse you, then.  I appreciate your honest answers.

Id. at 16-17.

Later, another prospective juror, a real estate agent, expressed a concern regarding

07cr1372 JAH

the disparity between state and federal law with respect to medical marijuana.  Judge Burns responded:

> Well, those things – the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that – we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things.  We'd ask you to also abide by that.  We want you to make a business-like decision and look at the facts and make a determination of whether there was a [sic] probable cause.

Id. at 25.

Subsequently, the prospective juror stated that he felt that drugs should be legal and that rapists and murderers, not people using drugs, should go to jail.  Id. at 25-26.  The following exchange ensued:

> The Court: I think rapists and murderers ought to go to jail too.  It's not for me as a judge to say what the law is.  We elect legislators to do that.  We're sort of at the end of the pipe on that.  We're charged with enforcing the laws that Congress gives us.
> I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make.  But my alternative is to vote for someone different, vote for someone that supports the policies I support and get the law changed.  It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."
> You'd have a similar obligation as a grand juror even though you might have to grit your teeth on some cases.  Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana.  I don't know if that's it but you'd vote against criminalizing some drugs.
> That's not what your prerogative is here.  Your prerogative instead is to act like a judge and to say, "All right.  This is what I've got to deal with objectively.  Does it seem to me that a crime was committed?  Yes.  Does it seem to me that this person's involved?  It does."  And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward.
> I can understand if you tell me, "Look, I get all that, but I just can't do it or I wouldn't do it."  I don't know what your frame of mind is.  You have to tell me about that.
>
> Prospective Juror: I'm not comfortable with it.
>
> The Court: Do you think you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?
>
> Prospective Juror: It would depend upon the case.
>
> The Court: Is there a chance that you would do that?
>
> Prospective Juror: Yes.
>
> The Court: I appreciate your answers.  I'll excuse you at this time.

07cr1372 JAH

Id. at 26-28.

Later, a potential juror said that he was "soft" on immigration because he had done volunteer work with immigrants in the field, but that he could be fair and objective. Judge Burns stated: "As you heard me explain earlier to one of the prospective grand jurors, we're not about trying to change people's philosophies and attitudes here. That's not my business. But what I have to insist on is that you follow the law that's given to us by the United States Congress. We enforce the federal laws here." Id. at 61. This juror was not excused.

**B. Charge to Impaneled Grand Jury**

After the grand jury was impaneled, Judge Burns gave further instructions regarding the responsibilities of the grand jurors.

With respect to the enforcement of federal laws, Judge Burns explained:

> But it's not for you to judge the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity is [sic] criminal is not up to you. That's a judgment that Congress makes.
> And if you disagree with that judgment made by Congress, then your option is not to say, 'Well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of [indictment] even though the evidence may be insufficient.' Instead, your obligation is to contact your congressman or advocate for a change in the laws, but not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting.
> Furthermore, when you're deciding whether to indict or not to indict, you shouldn't be concerned with punishment that attaches to the charge. I think I also alluded to this in the conversation with one gentleman. Judges alone determine punishment. We tell trial juries in criminal cases that they're not to be concerned with the matter of punishment either. Your obligation at the end of the day is to make a business-like decision on facts and apply those facts to the law as it's explained and read to you.

App. 1 to Gov't Response at 8-9.

With respect to exculpatory evidence, Judge Burns stated: "As I told you, in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." Id. at 20. Later, Judge Burns said, "If past experience is any indication of what to expect in the future, then you can expect that the U.S. Attorneys that will appear in front of you will be candid, they'll be honest, that they'll act in good faith in all matters presented to you." Id. at 27.

07cr1372 JAH

### III.  DISCUSSION

**A.  Instructions Re: Role of Grand Jury**

Defendant contends that Judge Burns' instructions and the dismissal of two potential jurors deprived Defendant of the traditional functioning of the Grand Jury. Specifically, Defendant claims that the challenged statements in combination with the dismissal of the two potential jurors "flatly prohibited grand jurors from exercising their constitutional discretion to not indict even if probable cause supports the charge." (Def.'s Reply Br. 8.)  Looking at the instructions as a whole, the Court disagrees.

Judge Burns made it clear that the jurors were not to refuse to indict in the face of probable cause *on the ground that they disagreed with Congress's decision to criminalize certain activity*.  Judge Burns did not err in doing so.  In United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir. 2005) ("Navarro-Vargas II"), the Ninth Circuit upheld the model grand jury instruction that states: "You cannot judge the wisdom of the criminal laws enacted by Congress, that is, whether or not there should or should not be a federal law designating certain activity as criminal.  That is to be determined by Congress and not by you."  The majority opinion observed that the instruction was not contrary to any long-standing historical practice surrounding the grand jury and noted that shortly after the adoption of the Bill of Rights, federal judges charged grand juries with a duty to submit to the law and to strictly enforce it.  Id. at 1193,1202-03.  "We cannot say that the grand jury's power to judge the wisdom of the laws is so firmly established that the district court must either instruct the jury on its power to nullify the laws or remain silent."  Id. at 1204.

A prohibition against judging the wisdom of the criminal laws enacted by Congress amounts to the same thing as a prohibition against refusing to indict based on disagreement with the laws.  It is true that Judge Burns used stronger language that, viewed in isolation, could be misconstrued as requiring the return of an indictment in *all* cases where probable cause can be found.  Particularly troubling is the following statement made to the real estate agent: "Your prerogative instead is to act like a judge and to say, 'All right.  This is what I've got to deal with objectively.  Does it seem to me that a crime

was committed?  Yes.  Does it seem to me that this person's involved?  It does.'  *And then your obligation*, if you find those things to be true, *would be to vote in favor of the case going forward*."  App. 2 to Gov't Response at 26.  However, viewed in context, Judge Burns was not mandating the issuance of an indictment in *all* cases where probable cause is found; he was explaining that disagreement with the laws should not be an obstacle to the issuance of an indictment.[2]

Furthermore, the word "obligation" is not materially different than the word "should."  In <u>Navarro-Vargas II</u>, the majority opinion held that the model instruction that the jurors "should" indict if they find probable cause does not violate the grand jury's independence.  The majority explained, "As a matter of pure semantics, it does not 'eliminate discretion on the part of the grand jurors,' leaving room for the grand jury to dismiss even if it finds probable cause."  <u>Navarro-Vargas II</u>, 408 F.3d at 1205 (quoting <u>United States v. Marcucci</u>, 299 F.3d 1156, 1159 (9th Cir. 2002)).  The dissenting opinion notes that the word "should" is used "to express a duty [or] *obligation*."  <u>Id.</u> at 1121 (quoting The Oxford American Diction And Language Guide 931 (1999)) (emphasis added).[3]

Defendant also argues that Judge Burns improperly forbade the grand jury from considering the potential punishment for crimes when deciding whether or not to indict.  Defendant relies on the following statement:

> Well, those things – the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that – we tell trial jurors, of course, that they cannot consider the punishment or the

---

[2]  The Supreme Court has recognized that a grand jury is not required to indict in every case where probable cause exists.  In <u>Vasquez v. Hillery</u>, 474 U.S. 254, 263 (1986), the Supreme Court explained: "The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not.  In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a noncapital offense - all on the basis of the same facts.  Moreover, '[t]he grand jury is not bound to indict in every case where a conviction can be obtained.' <u>United States v. Ciambrone</u>, 601 F.2d 616, 629 (2d Cir. 1979) (Friendly, J., dissenting)."

[3] Defendant concedes that at other times Judge Burns instructed that upon a finding of probable cause, the case "should" go forward.  App. 2 to Gov't Response at 8, 17; App. 1 to Gov't Response at 4, 23.

07cr1372 JAH

consequence that Congress has set for these things. *We'd ask you to also abide by that.* We want you to make a business-like decision and look at the facts and make a determination of whether there was a probable cause.

App. 2 to Gov't Response at 25. (Emphasis added.) Although Judge Burns stated that trial jurors *cannot* consider punishment, he did not impose such a restriction on the grand jurors. Instead, Judge Burns *requested* that the grand jurors follow the same principle. Similarly, during the formal charge, Judge Burns stated, "[y]ou *shouldn't* be concerned with punishment that attaches to the charge." App. 1 to Gov't Response at 8. (Emphasis added.)

In United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006), the Ninth Circuit upheld a jury instruction that stated: "[W]hen deciding whether or not to indict, you *should not* be concerned about punishment in the event of conviction; judges alone determine punishment." (Emphasis added.) Consistent with the reasoning in Marcucci and Navarro-Vargas II, the Ninth Circuit held that the instruction did not place an absolute bar on considering punishment and was therefore constitutional. The instructions given by Judge Burns regarding the consideration of punishment were substantially the same as the instruction in Cortez-Rivera.

Judge Burns did not pronounce a general prohibition against jurors exercising their discretion to refuse to return an indictment in the face of probable cause. In any case, "history demonstrates that grand juries do not derive their independence from a judge's instruction. Instead they derive their independence from an unreviewable power to decide whether to indict or not." Navarro-Vargas II, 408 F.3d at 1204.

Judge Burns informed the jurors about the utmost secrecy of the grand jury proceedings and their deliberations. In addition, a video shown to the potential grand jurors titled, "The Federal Grand Jury: The People's Panel," which was intended to educate potential grand jurors about their responsibilities as grand jurors, also informed the jurors of the secrecy of the proceedings. Judge Burns and the video also emphasized to the jury that they were independent of the Government and did not have to return an indictment just because the Assistant U.S. Attorney asked them to. Judge Burns characterized the

1   jury as "a buffer between our Government's ability to accuse someone of a crime and then

2   putting that person through the burden of standing trial."  App. 1 to Gov't Response at

3   26.  Judge Burns also told the jurors that they were not to be a "rubber stamp" and were

4   expected to depend on their independent judgment.  Id, at 27.

5       Even though the jurors were not explicitly instructed that they could use their

6   discretion to refuse to return an indictment, they retained that power by virtue of the

7   secrecy surrounding their deliberations and the unreviewability of their decisions.  Nothing

8   that Judge Burns said or did impinged on the jurors' independence in this regard.

9       Defendant counters that the dismissal of the two potential jurors undermined the

10  grand jury's independence from the very start.  According to Defendant, when Judge Burns

11  dismissed the jurors, the message was clear that they were to indict in every case where

12  there was probable cause or they would be excused.  Defendant contends that the

13  remaining grand jurors could not have understood Judge Burns' actions in any other way.

14  (Reply Br. 18.)  The Court disagrees.

15      Upon reading the voir dire transcript, it is apparent that the jurors were excused

16  because they were biased against the government with respect to a whole category of

17  criminal laws, not simply because they were independent-minded and might refuse to

18  return an indictment in a case where probable cause exists.  Judge Burns explained to the

19  clinical social worker, "We're all products of our experience.  We're not going to try to

20  disabuse you of experiences or judgments that you have.  What we ask is that you not

21  allow those to control invariably the outcome of the cases coming in front of you; that you

22  look at the cases fresh, you evaluate the circumstances, listen to the witness testimony, and

23  then make an independent judgment."  App. 2 to Gov't Response at 15.  Judge Burns

24  excused the social worker after he admitted that it would be difficult for him to return an

25  indictment in drug or immigration cases.

26      Similarly, the real estate agent expressed that he thought drugs should be legal and

27  that people using drugs should not be sent to jail.  App. 2 to Gov't Response at 25-26.

28  The real estate agent said that he was not comfortable with indicting in drug cases.

1  Although he did not say that he would refuse to indict in all cases involving drugs, he

2  admitted that because of his beliefs, there was a chance that he would refuse to return an

3  indictment in a drug case even though there was probable cause.  <u>Id.</u> at 27.  The real estate

4  agent's responses established that he had serious concerns regarding the criminalization

5  of drugs and could not be impartial with respect to these cases

6      That bias was the reason for the dismissal of the first two potential  jurors is

7  confirmed by the dismissal of a third potential juror.  This juror stated that he had a

8  strong bias for the Government.  App. 2 to Gov't Response at 38.  Judge Burns cautioned

9  the juror that he should not "automatically defer to [the Government] or surrender the

10  function and give the indictment decision to the U.S. Attorney.  You have to make that

11  independently."  <u>Id.</u> at 40.  Judge Burns emphasized once again the responsibility of the

12  jurors to evaluate the facts of each case independently based on the evidence presented.

13  <u>Id.</u> at 42-43.  Demonstrating his even-handedness, Judge Burns explained, "I'm equally

14  concerned with somebody who would say, 'I'm going to automatically drop the trap door

15  on anybody the U.S. Attorney asks.'  I wouldn't want you to do that."  <u>Id.</u> at 44.

16      A reasonable grand juror would not have interpreted the dismissal of the first two

17  potential jurors as a message that they must indict in all cases where probable cause is

18  found or risk being excused from service.  It was apparent to the other jurors that a lack

19  of impartiality with respect to certain types of cases, *not* independence, was the reason for

20  all three dismissals.

21      In sum, Judge Burns did not err in instructing the grand jurors that they were not

22  to refuse to return an indictment on the ground that they disagreed with the laws.

23  Furthermore, nothing in the video or Judge Burns' instructions nullified the grand jury's

24  inherent power to refuse to indict for any reason whatsoever.  As the Ninth Circuit noted

25  in <u>Navarro-Vargas II</u>, 408 F.3d at 1204, the grand jury's independence results from the

26  secrecy of their deliberations and the unreviewability of their decisions.  Nothing in the

27  record shows any impediment to that independence.

28  **B.**    **Instructions re: Assistant U.S. Attorneys**

Defendant also contends that Judge Burns committed structural error by making comments about the Assistant U.S. Attorney's duty to present evidence that "cuts against the charge." According to Defendant, not only did Judge Burns' comments contradict United States v. Williams, 504 U.S. 36 (1992), but also discouraged independent investigation, leading to inaccurate probable cause determinations. Defendant reasons that given Judge Burns' comments, the grand jurors would have assumed that if the prosecutor did not present any exculpatory evidence, then none exists, rendering further investigation a waste of time.

Under Williams, prosecutors do not have a duty to present substantial exculpatory evidence to the grand jury. Although Assistant U.S. Attorneys apparently have an employment duty to disclose "substantial evidence that directly negates the guilt" of a subject of investigation (United States Attorneys' Manual § 9-11.233), it does not appear that they have a broad duty to disclose all evidence that may be deemed exculpatory or adverse to the Government's position.

Accordingly, Judge Burns' comments regarding the duty of Assistant U.S. Attorneys to present adverse evidence were inaccurate. However, Judge Burns' comments do not rise to the level of structural error. As discussed above, the video and Judge Burns stressed that the grand jury was independent of the Government. The video and Judge Burns also explained to the jury that they could direct the Assistant U.S. Attorney to subpoena additional documents or witnesses. App. 1 to Gov't Response at 11, 24. The jurors were also told about their right to pursue their own investigation, even if the Assistant U.S. Attorney disagrees with the grand jury's decision to pursue the subject. Id. at 12.

In light of the foregoing instructions, the Court does not agree that the grand jurors would assume that if the Government did not present any exculpatory evidence, none exists. A reasonable juror would understand that the Assistant U.S. Attorney may not be aware of certain exculpatory evidence, whether due to legitimate circumstances or inadequate investigation, and that further investigation by the grand jury may be needed to properly evaluate the evidence before them. Furthermore, Judge Burns told the jury

07cr1372 JAH

that "in *most* instances" the U.S. Attorneys are duty-bound to present exculpatory evidence. App. 1 to Gov't Response at 20. Based on this qualifying language, the grand jurors would have understood that the prosecutor is not always bound to present exculpatory evidence. Thus, "the structural protections of the grand jury" have not "been so compromised as to render the proceedings fundamentally unfair." Bank of Nova Scotia v. United States, 487 U.S. 250, 257 (1988).

### IV.  CONCLUSION

For the reasons discussed above, Defendant's Motion to Dismiss the Indictment Due to Erroneous Grand Jury Instruction is **DENIED**.

DATED:  December 5, 2007

_____

HON. JOHN A. HOUSTON
United States District Judge

**IT IS SO ORDERED.**

11

07cr1372 JAH

GOVERNMENT
EXHIBIT

7

     a.    Creating false deductions and placing them in the Contributions section of their

clients' tax returns;

     b.    Creating false deductions and placing them in the Miscellaneous Business

Expense section of their clients' tax returns;

     c.    Falsifying amounts and placing them in the Child Care section of their clients' tax

return; and/or

     d.    Fabricating businesses to create false deductions

9.    I also have probable cause to believe that the GARRETT'S evaded their personal

income taxes during these years by underreporting a substantial amount of income earned

through their tax preparation business.

10.    The evidence of criminal activity set forth in this affidavit was obtained from an

anonymous informant, undercover activities, a review of Federal Income Tax Returns,

surveillance, IRS databases, publicly filed documents, information received from other IRS

special agents, and information gained from my training and experience.

**SOURCE OF THE INVESTIGATION**

11.    This investigation began as a referral from an anonymous informant.  On or about March

11, 2002, the informant reported to the IRS that FAYES TAX SERVICE prepared false tax

returns for its clients. The informant prepared and submitted a report detailing the information

about FAYES TAX SERVICE. The report listed the number 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 as the SSN associated

with FAYES TAX SERVICE.  IRS records revealed that this number was issued to FE

GARRETT. The report indicated that FE GARRETT prepared hundreds to thousands of tax

returns each year.  It is alleged that FE GARRETT prepared many tax returns containing false

information in the "Gifts to Charity" and "Miscellaneous Deduction" sections of the tax return's

schedule A. The informant stated that FE GARRETT'S clients were recruited through word of

mouth or through recommendations from other clients who had received large refunds through

claiming excessive deductions.  Attached to this information, the informant provided a 2000 tax

1   return allegedly prepared by FE GARRETT. The report suggests that the informant is a tax

2   preparer, and that a new client provided this tax return to the informant. Below the preparers'

3   signature line on the return listed FAYES TAX SERVICE, 1210 E. 2nd St. National City, CA.

4   91950.  Although there was no personal identifying information of the taxpayer on the return

5   provided, it contained deductions in the amount of $10,800 in the "Gifts to Charity" and $2,233

6   in the "Other Miscellaneous Deduction" sections of the return.  This enabled the taxpayer to

7   receive a refund of $2,280. These amounts were allegedly inflated figures that resulted in the

8   taxpayer receiving a greater refund than they were entitled to.

9   12.    Based on the informant information provided, a criminal investigation was initiated into

10  FE GARRETT and FAYES TAX SERVICE.

11                                   **UNDERCOVER OPERATIONS**

12  13.    Based on the above mentioned information and information obtained from the informant

13  and after analyzing tax returns, an Undercover Operation was initiated. On January 31, 2003,

14  an Undercover Operation into the tax preparation activities of FE GARRETT was authorized.

15  An Undercover Agent (UCA) was assigned to "shop" FE GARRETT'S tax business located at

16  914 E. 8th Street National City, CA.  ("Shopping" is a term commonly used by IRS-CI to describe

17  Undercover Agents posing as clients in order to have a tax practitioner prepare their tax

18  returns).

19  14.    On February 10, 2003, an undercover agent (UCA) placed a consensually monitored

20  phone call to the office of FE GARRETT in efforts to schedule an appointment to have an

21  income tax return prepared for the year 2002.  A male (later identified as GREG GARRETT)

22  answered the telephone. He stated that FE GARRETT was not in the office and they were no

23  longer accepting appointments to prepare tax returns due to the existing volume of returns they

24  had to prepare with the approaching filing deadline. GREG GARRETT told the UCA that they

25  could file an extension and leave their tax return information at FE GARRETT'S office for

    preparation.

                                            -4-